## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **GUIZHOU TYRE CO., LTD. AND GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.**, et al., | |
| Plaintiffs, | **Before: Timothy C. Stanceu, Chief Judge** |
| v. | **Consol. Court No. 18-00099** |
| **UNITED STATES,** | |
| Defendant. | |

### OPINION AND ORDER

[Ordering reconsideration of an agency determination concluding an administrative review of an antidumping duty order on off-the-road tires from the People's Republic of China]

Dated:  August 14, 2020

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd., Guizhou Tyre Import and Export Co., Ltd., and GTC North America, Inc.  With him on the brief were *James P. Durling* and *Tung A. Nguyen*.

*Richard P. Ferrin*, Faegre Drinker Biddle & Reath LLP, of Washington, D.C., for plaintiff Valmont Industries, Inc.  With him on the brief was *Douglas J. Heffner*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant.  Of counsel on the brief was *Kristen McCannon*, Attorney, Office of the Chief Counsel For Trade Enforcement & Compliance, U.S. Department of Commerce.

Stanceu, Chief Judge: Plaintiffs contest an administrative determination issued by the

International Trade Administration, U.S. Department of Commerce ("Commerce" or the

"Department"), to conclude the eighth periodic review of an antidumping duty ("AD") order on

certain off-the-road ("OTR") tires from the People's Republic of China ("China" or the "PRC").

Before the court are motions for judgment on the agency record challenging various

aspects of the contested determination.  Also before the court are a motion, and a second request,

for remand by defendant United States.  The court remands the contested determination for

reconsideration by Commerce.

## I. BACKGROUND

### A. The Contested Determination

The determination contested in this consolidated action[1] (the "Final Results") is *Certain*

*New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of*

*Antidumping Duty Administrative Review and New Shipper Review; 2015-2016*, 83 Fed. Reg.

16,829 (Int'l Trade Admin. Apr. 17, 2018) ("*Final Results*").  Incorporated by reference in the

Final Results is an "Issues and Decision Memorandum" ("Final I&D Mem.") containing

explanatory discussion.  *Issues and Decision Memorandum for the Antidumping Duty*

*Administrative Review and New Shipper Review: Certain New Pneumatic Off-the-Road Tires*

*from the People's Republic of China; 2015-2016* (Int'l Trade Admin. Apr. 11, 2018) (P.R. Doc.

300) ("*Final I&D Mem.*").

### B. The Parties to this Consolidated Case

There are four plaintiffs in this consolidated action.  Guizhou Tyre Co., Ltd., a Chinese

producer of OTR tires, and Guizhou Tyre Import and Export Co., Ltd. ("GTCIE"), a wholly

owned subsidiary of GTC Tyre Co., Ltd. (collectively, "GTC"), are plaintiffs; Commerce

decided to treat these two companies as a single entity (i.e., a single "exporter-producer") in

conducting the eighth review, a decision not contested in this case.  *See Final I&D Mem.* at

---

[1] Consolidated with the lead case, *Guizhou Tyre Co. et al. v. United States*, Court No. 18-00099, is *Valmont Industries, Inc. v. United States*, Court No. 18-00110.  *See* Order Granting Mot. to Consolidate Cases (June 25, 2018), ECF No. 14.

1 n.2.  GTC North America, Inc. ("GTC North America"), a U.S. importer and wholly owned

affiliate of Guizhou Tyre Import and Export Co., Ltd., is also a plaintiff, as is Valmont

Industries, Inc. ("Valmont"), an unaffiliated U.S. importer.

### C. Proceedings Conducted by Commerce that Culminated in the Final Results

Background pertinent to this litigation stems from the administrative proceeding

culminating in the contested decision and also from decisions made in previous, related

proceedings conducted by Commerce.  The court summarizes the procedural background below.

Commerce issued an antidumping duty order on OTR tires from China (the "Order") in

2008.  *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice*

*of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping*

*Duty Order*, 73 Fed. Reg. 51,624 (Int'l Trade Admin. Sept. 4, 2008).

In antidumping duty proceedings involving nonmarket economy ("NME") countries,

including China, Commerce has adhered to a practice under which it applies a rebuttable

presumption that all companies within the nonmarket economy country are controlled by the

government of that country.  *See Notice of Final Determination of Sales at Less Than Fair*

*Value: Silicon Carbide From the People's Republic of China*, 59 Fed. Reg. 22,585, 22,587 (Int'l

Trade Admin. May 2, 1994) ("*Silicon Carbide*"); *Final Determination of Sales at Less Than Fair*

*Value: Sparklers From the People's Republic of China*, 56 Fed. Reg. 20,588, 20,589 (Int'l Trade

Admin. May 6, 1991).  An exporter may overcome the presumption of government control by

convincing Commerce that it is subject neither to *de jure* nor to *de facto* control of the

government of the NME country.  *Silicon Carbide*, 59 Fed. Reg. at 22,587.

In the antidumping duty investigation resulting in the Order, Commerce assigned GTC,

and 28 other companies, a "separate rate," which was a rate other than the rate Commerce

assigned to exporters and producers it considered to have failed to rebut its presumption of government control. *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40,485, 40,487 (Int'l Trade Admin. July 15, 2008). Commerce placed those companies it considered to have failed to rebut its presumption within what it called the "PRC-wide" (or "China-wide") "entity," to which it assigned a "PRC-wide" (or "China-wide") rate. *Id*. at 40,488.

In the investigation, GTC was one of the companies individually investigated; Commerce assigned GTC an estimated weighted average dumping margin of 4.08%. *Id.* at 40,489. Concluding that the government of the PRC did not provide requested information, Commerce assigned the PRC-wide entity a rate of 210.48% based on "facts otherwise available" under 19 U.S.C. § 1677e(a) and an "adverse inference" under 19 U.S.C. § 1677e(b). *Id*. at 40,488. Commerce calculated this rate from information it obtained from the petition. *Id.*

In the fifth periodic administrative review of the Order, Commerce selected GTC as one of two mandatory respondents, again determined that GTC was eligible for a separate rate based on demonstrated independence from government control, and assigned GTC a weighted average dumping margin of 11.34%, calculated from GTC's own sales and production data. *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 20,197, 20,198–99 (Int'l Trade Admin. Apr. 15, 2015) ("*AR5 Final Results*"). Commerce again selected GTC as a mandatory respondent for the seventh administrative review, but this time Commerce determined that GTC had not demonstrated independence from the PRC government and assigned to GTC the PRC-wide rate of 105.31%. *See Certain New Pneumatic Off-the-Road Tires From the*

*People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733, 18,735 (Int'l Trade Admin. Apr. 21, 2017) ("*AR7 Final Results*").

The PRC-wide rate of 105.31% that Commerce assigned to GTC in the eighth review was carried over from the final results of the fifth administrative review into subsequent reviews. Commerce determined this PRC-wide rate in the fifth review by calculating the average of the 210.48% PRC-wide rate prior to the fifth review (determined in the investigation) and a 0.14% rate Commerce calculated for, but did not assign to, a respondent in the fifth review, Double Coin Holdings, Ltd. ("Double Coin"), which is not a party to this case. *See AR5 Final Results*, 80 Fed. Reg. at 20,199. Double Coin challenged the Department's assigning it the 105.31% rate in the fifth administrative review, a rate that was based in part on the application of facts otherwise available and an adverse inference. *See China Mfrs. All., LLC v. United States*, 43 CIT __, __, 357 F. Supp. 3d 1364, 1379–80 (2019).

Commerce initiated the eighth review of the Order by notice ("Initiation Notice") in November 2016. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 78,778, 78,783 (Int'l Trade Admin. Nov. 9, 2016) ("*Initiation Notice*"). The eighth review pertained to entries of subject merchandise made during the period of review ("POR") of September 1, 2015 through August 31, 2016. *Id.*

Commerce published the preliminary results of the eighth review ("Preliminary Results") on October 10, 2017, selecting two companies, GTC and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei") for individual examination as "mandatory" respondents. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Rescission of New Shipper Review; 2015-2016*, 82 Fed. Reg. 46,965, 46,966 (Int'l Trade Admin. Oct. 10, 2017) ("*Prelim. Results*"). In the

Preliminary Results, Commerce preliminarily concluded that GTC had not demonstrated its

independence from control by the government of China and, therefore, was ineligible for

separate rate status. *Id.* Incorporated by reference in the Preliminary Results is a "Decision

Memorandum" containing explanatory discussion. *Decision Memorandum for Preliminary*

*Results of the Antidumping Duty Administrative Review and Preliminary Rescission of New*

*Shipper Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of*

*China; 2015-2016* (Int'l Trade Admin. Oct. 2, 2017) (P.R. Doc. 258) ("*Prelim. Dec. Mem.*").

      In the Final Results, Commerce concluded that GTC failed to demonstrate independence

from the PRC-wide entity and, on that basis, assigned GTC the PRC-wide rate of 105.31%.

*Final Results*, 83 Fed. Reg. 16,830–31. Commerce assigned Zhongwei an individually

determined weighted average dumping margin of 11.87% and assigned that rate to two separate

rate respondents (Qingdao Qihang Tyre Co., Ltd. and Shandong Zhentai Group Co., Ltd). *Id.* at

16,830.

### D. Proceedings Before the Court

      Before the court is the Rule 56.2 motion for judgment on the agency record of GTC and

GTC North America. [GTC's] Mot. for J. on the Agency R. & Br. of [GTC] in Supp. of Mot. for

J. on the Agency R. (Sept. 17, 2018), ECF Nos. 22 (conf.), 23 (public) ("GTC's Br."). Valmont

also moves for judgment on the agency record, adopting in full the arguments put forth by GTC

and GTC North America. Mot. of Consol. Pl. Valmont Indus., Inc. for J. on the Agency R. under

Rule 56.2 (Sept. 17, 2018), ECF No. 24. Defendant opposes plaintiffs' motions. Def.'s Resp. to

Mots. for J. on the Agency R. (Dec. 17, 2018), ECF No. 28 ("Def.'s Br.").

      Defendant has filed two requests for remand. Stating that "Commerce has identified the

need to reexamine certain evidence on the record related to the Chinese government's

involvement in GTC," defendant requests "that the Court remand the matter to Commerce so that Commerce can revisit the issue of GTC's rate."  Def.'s Mot. for Voluntary Remand 1 (July 6, 2018), ECF No. 16.  Plaintiffs do not oppose defendant's request *per se* but maintain their challenge to the Department's separate rate decision in the entirety.  GTC's Resp. to Def.'s Mot. for Partial Voluntary Remand (July 20, 2018), ECF No. 19 ("GTC's Opp'n Br.").  In its brief opposing plaintiffs' motions, defendant also requests a remand to allow Commerce to reconsider, in light of the decision of this Court in *Thuan An Production Trading & Service Co. v. United States*, 42 CIT __, 348 F. Supp. 3d 1340 (2018) ("*Thuan An I*"), the explanation Commerce provided in the Final Results of its statutory authority to apply what it terms "nonmarket economy-wide" (or "NME-wide") rates in proceedings such as this one, in which the exporting country is considered by Commerce to be a nonmarket economy.  Def.'s Br. 8–10.  Plaintiffs oppose this motion, urging that the court "instead render a decision addressing GTC's argument that Commerce had no authority to assign a PRC-wide AD rate to GTC."  Reply Br. of Pls. GTC 5 (Jan. 14, 2019), ECF No. 29 ("Reply of GTC").

The court held oral argument on June 27, 2019.  Oral Arg. (June 27, 2019), ECF No. 42.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c) (2012), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended* 19 U.S.C. § 1516a (2012),

including an action contesting a final determination that Commerce issues to conclude an

administrative review of an antidumping duty order.[2]

In reviewing a final determination, the court "shall hold unlawful any determination,

finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or

otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence

refers to "'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B. Plaintiffs' Motion for Judgment on the Agency Record

Plaintiffs raise, essentially, four claims in contesting the Final Results.

They claim, first, that Commerce violated the antidumping duty statute in determining,

and assigning to GTC, a rate for the PRC-wide entity. GTC's Br. 8–27. They advance several

grounds for this claim. They maintain that in an antidumping duty proceeding (as opposed,

specifically, to a countervailing duty proceeding), the statute confines Commerce to assigning

respondents either an individually determined margin or an "all-others" rate, and that the rate

Commerce determined for the PRC-wide entity and assigned to GTC falls into neither of these

categories. *Id.* at 11–15. Plaintiffs also argue that the statute, while creating special rules in

19 U.S.C. § 1677(18) for identifying nonmarket-economy countries and in 19 U.S.C. § 1677b(c)

for determining normal value in antidumping cases involving such countries, applies the

"standard statutory rules" to Chinese entities for other determinations, including the rules for

determining U.S. prices and dumping margins, and "does not empower Commerce to write a

---

[2] All citations to the United States Code herein are to the 2012 edition and all citations to the Code of Federal Regulations herein are to the 2016 edition, except where otherwise indicated.

whole new type of AD margin from scratch for non-market economies." *Id.* at 15–16. Maintaining that Commerce was required to conduct an individual review of GTC, plaintiffs characterize the rate Commerce assigned to the PRC-wide entity, and the PRC-wide entity itself, as "fictitious." *Id.* at 2, 11, 13, 52. Plaintiffs, in effect, challenge the legal basis for the Department's practice of determining and assigning a rate for the PRC-wide entity as applied in the eighth review.

Plaintiffs also direct certain arguments to the Department's regulations. They argue that a provision therein, 19 C.F.R. § 351.107(d) ("In an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."), even if presumed valid (which they do not concede), does not describe what Commerce did in the eighth review, which was create a "third" kind of rate applicable only to the PRC-wide entity. *Id.* at 26–27.

Plaintiffs' second claim is related to their first. They assert that even were Commerce presumed to have authority to invent a new type of rate for the PRC-wide entity, it could not do so by carrying over the 105.31% rate from prior reviews and applying it to GTC, which, they maintain, fully cooperated in the review. *Id.* at 50–53. They argue that Commerce, even under such a presumption, would have been required to calculate a new rate for the PRC-wide entity in the eighth review and was required to do so using GTC-specific data. *Id.* at 50–52. They take issue with the Department's rationale for not reviewing the PRC-wide entity, which was that no review of the PRC-wide entity was requested. *Id.* at 52. They argue that the Department's regulations did not allow them to request a review of the PRC-wide entity, and, further, that they could not have requested such a review without conceding they were part of what they characterize as a "fictitious" entity. *Id.* Further, they maintain that, in any event, the request for

the review of GTC should have been deemed sufficient to require Commerce to conduct a review of the PRC-wide entity, under which Commerce should have calculated an individual margin for GTC based on GTC's own data.  *Id.* at 52–53.

Plaintiffs claim, third, that Commerce erred in concluding that GTC had not put forth information establishing independence from the Chinese government and, specifically, in determining that the government of the PRC controls GTC's export activities.  *Id.* at 28–50. They argue that in making these determinations, Commerce did not follow the correct criteria, *id.* at 28–30, and reached a determination unsupported by substantial evidence on the record of the review, *id.* at 31–50.

Finally, plaintiffs claim that in assigning GTC the rate of 105.31%, Commerce unlawfully refused to make adjustments for subsidies found in the parallel administrative review of a countervailing duty order on OTR tires from China.  *Id.* at 53–55.

## C. Defendant's Motion that Commerce Be Permitted to Reconsider Its Decision that GTC Is Part of the "PRC-Wide Entity"

Declining to depart from its analysis in the Preliminary Results, Commerce stated that "[f]or the final results, we continue to find, based on record evidence, that GTC is not eligible for a separate rate."  *Final I&D Mem.* at 19.  Before the court, plaintiffs contest this determination on various factual grounds.  Rather than respond substantively to plaintiffs' arguments, defendant "respectfully requests a voluntary remand," without confessing error, for Commerce to reconsider and explain its determination as to whether GTC qualifies for a separate rate according to the Department's criteria.  Def.'s Br. 10.

Commerce stated in the Final I&D Mem. that "[t]o demonstrate independence from government control and qualify for a separate rate, exporters must affirmatively demonstrate both the *de jure* and *de facto* absence of government control over their export activities."  *Final*

*I&D Mem.* at 19. In the eighth review, Commerce concluded that GTC demonstrated *de jure* independence from government control but failed to demonstrate *de facto* independence under a four-factor test. *Id.* (footnote omitted).[3] Commerce also found that, because GTCIE was a wholly owned subsidiary of Guizhou Tyre Co., Ltd., it too was subject to government control. *Id.* at 20. On that basis, Commerce considered the combined GTC entity subject to government control, *id.* at 19, and assigned it the PRC-wide rate of 105.31%. *Final Results*, 83 Fed. Reg. at 16,830.

Commerce found that GTC's largest shareholder, Guiyang Industry Investment (Group) Co., Ltd. ("GIIG"), a state-owned enterprise, had increased its ownership share of Guizhou Tyre Co., Ltd. from 25.20% during the period of the prior review to 25.33% during the POR and that the next nine largest shareholders decreased their shares to only a combined 4.7% for the POR, "further consolidating Guiyang SASAC's position as the controlling party." *Final I&D Mem.* at 20 (footnote omitted).[4] Noting that, based on several factors, it had "determined in the prior

---

[3] The memorandum explains that "Commerce typically considers four factors in evaluating whether a respondent is subject to *de facto* governmental control of its export functions: (1) whether the export prices are set by, or subject to the approval of, a governmental authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the central, provincial, and local governments in making decisions regarding the selection of its management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses." *Issues and Decision Memorandum for the Antidumping Duty Administrative Review and New Shipper Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2015-2016*, at 19 (Int'l Trade Admin. Apr. 11, 2018) (P.R. Doc. 300) ("*Final I&D Mem.*") (footnote omitted).

[4] In using the term "Guiyang SASAC," *Final I&D Mem.* at 20, Commerce referred to China's state-owned Assets Supervision and Administration Commission in Guiyang, China. Commerce incorporated into the Final I&D Mem. by reference its earlier "Preliminary Separate Rate Memorandum," *Certain New Pneumatic Off-Road Tires from the People's Republic of China: Preliminary Separate Rate Determination for GTC* (Int'l Trade Admin. Oct. 2, 2017) (P.R. Doc. 260) ("*Prelim. Separate Rate Mem.*"). *Final I&D Mem.* at 21. In the Preliminary (continued . . .)

[seventh] review that GTC had failed to demonstrate the absence of *de facto* government control over its export activities," *id.* at 19, Commerce concluded, further, that GTC failed to present any new information since the prior review that would require Commerce to reconsider its finding of *de facto* government control over GTC's export activities.  *Id.* at 21.

According to Commerce, record evidence from the prior review "demonstrated that GIIG circumvented an inclusive board election process to elect members of GTC's board through a shareholder's meeting that was not available to all shareholders."  *Id.* at 20.  Commerce concluded in that review that "[b]ecause we found that there was no 'practical difference' between the shareholder elections and GIIG 'directly appointing board members by direct decree,' we determined that 'GIIG appointed a majority of the members of GTC's board of directors as evidence in the voting records for the shareholder meetings.'"  *Id.* (quoting an "Issues and Decision Memorandum" incorporated by reference in to the *AR7 Final Results*).  Commerce also addressed the contention that shareholder voting protections in GTC's Articles of Association, such as cumulative voting and online voting, prevented GIIG from exercising *de facto* control over the election of directors and selection of management.  *Id.*  Commerce found that, due to a decrease in the relative holdings of other major shareholders in GTC, "GIIG's ability to exert *de facto* control over the management and operational decisions of GTC has been strengthened through the dilution of shares by other shareholders during this POR in relation to the prior POR."  *Id.*  The evidence further demonstrated, according to Commerce, that GIIG "selected the management and controlled the profit distribution for GTCIE."  *Id*.  The Final I&D

---

(. . . continued)

Separate Rate Memorandum, Commerce found that the Guiyang SASAC owned 100% of Guiyang Industry Investment (Group) Co., Ltd. ("GIIG"), *Prelim. Separate Rate Mem.* at 2; it also found that, after Guiyang SASAC, the next nine largest shareholders previously held a combined 33.99% share (as shown in GTC's 2015 annual report), *id.* at 4.

Mem. concluded that "Commerce continues to find that the *de facto* control over GTCIE's

selection of management through GIIG and GTC, and GTCIE's profit distribution, is indicative

of being a state-controlled entity and precludes GTC from eligibility for a separate rate." *Id.*

Before the court, defendant explains that "[o]ne factor that Commerce relied on in [its]

analysis was its finding that, GTC elected members of its board of directors 'through a

shareholder's meeting that was not available to all shareholders.'" Def.'s Br. 10–11 (quoting

*Final I&D Mem.* at 20). Before the court, plaintiffs call that factual finding into question,

explaining that "GTC's shareholder meetings are always available to *all* shareholders who wish

to attend," including the particular shareholders' meeting that Commerce found was not open to

all shareholders. GTC's Br. 34–35. Requesting a remand in this case, defendant explains that

because "Commerce's understanding of such record evidence has the potential to impact the

analysis concerning whether to grant GTC a separate rate in the underlying review," the

Department's concern is "substantial and legitimate," justifying a remand in this case. Def.'s

Br. 11 (quoting *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) ("*SKF*")).

Plaintiffs do not oppose defendant's request but maintain their challenge to the Department's

separate rate decision in the entirety. *See* GTC's Opp'n Br. 1–2.

The court exercises discretion in considering a request for a remand. "[I]f the agency's

concern is substantial and legitimate, a remand is usually appropriate." *SKF*, 254 F.3d at 1029.

Agreeing that the Department's concern regarding this issue is "substantial and legitimate," the

court is entering an order that permits Commerce, if it wishes to do so, to reconsider its separate

rate analysis on the issue of government control of the GTC entity.

If Commerce determines that GTC has rebutted its presumption of government control, it

must assign GTC, which Commerce selected as a mandatory respondent, an individual weighted

average dumping margin.  If Commerce decides that GTC has not rebutted the Department's

presumption, it must address the other issues plaintiffs raise that are related to the Department's

decision not to review GTC in the circumstances of the eighth review.  As discussed in the

remainder of this Opinion and Order, these are issues Commerce did not address, or failed to

address adequately, in the Final Results.

### D. Defendant's Request for a Remand on the Issue of Statutory Authority to Apply "NME-Wide Rates"

In support of its request for a remand on the issue of statutory authority to apply NME-

wide rates, defendant states that "[t]he Court should grant the Government's request for a

voluntary remand for Commerce to reconsider its explanation of its statutory authority to apply

NME-wide rates in light of this Court's findings in *Thuan An* [*I*]."  Def.'s Br. 5.  The court grants

this request but, for the reasons discussed below, does not limit the remand order to the narrow

issue defendant identifies.

The court rules that defendant's justification for requesting a remand limited to a narrow

issue is unsatisfactory because defendant is seeking a remand order limited to the Department's

crafting of a new or revised explanation for its current practice rather than a good faith re-

examination of the decision Commerce made in the Final Results not to review GTC and, as a

consequence, to assign GTC the rate for the PRC-wide entity that it carried over from the prior

review.  Such a re-examination is necessary in response to the issues raised by plaintiffs' claims

in this litigation.  The court considers those issues to include those raised by plaintiffs' claim that

the statute did not authorize Commerce to assign a PRC-wide rate and GTC's related claim that

the 105.31% rate was not a rate that lawfully could be applied to GTC, even if GTC were

considered part of any PRC-wide entity.  For the Final Results, Commerce addressed the issues

plaintiffs raised during the review, *see Final I&D Mem.* at 7–9, only superficially, relying largely

on its own practice rather than an analysis of its statutory and regulatory authority, *see Final*

*I&D Mem.* at 11–12.  Even absent a request from defendant, a remand would be required due to

the inadequacy of the Department's explanation.

       In summary, plaintiffs claim that the Tariff Act did not permit Commerce to apply its

practice in the way that it did in the eighth review and, in any event, that doing so was

inconsistent in some respects with the Department's own regulations.  Some of the issues

plaintiffs raise are questions of first impression, i.e., ones the courts have not addressed

previously.[5]

       Contested in *Thuan An I* were the final results of the twelfth administrative review of an

antidumping duty order on certain frozen fish fillets from Vietnam.  *Thuan An I*, 42 CIT at __,

348 F. Supp. 3d at 1342.  Considering a plaintiff's claim that Commerce lacked authority to

impose a Vietnam-wide rate in the final results because such a rate was neither an individual rate

nor an all-others rate, *id.* at __, 348 F. Supp. 3d at 1346–47, the opinion in *Thuan An I* noted that

defendant United States attempted to justify the Department's action by relying upon the

Department's regulation, 19 C.F.R. § 351.107(d) ("In an antidumping proceeding involving

imports from a nonmarket economy country, 'rates' may consist of a single dumping margin

applicable to all exporters and producers") while still insisting that the Vietnam-wide rate is

neither an individual rate nor an all others rate.  *Id.* at __, 348 F. Supp. 3d at 1348 & n.13.  The

---

       [5] The Court of Appeals for the Federal Circuit ("Court of Appeals") has reasoned that
statutory silence in 19 U.S.C. §§ 1673d and 1677e does not divest Commerce of "its broad
authority to devise alternate procedures to carry out the statutory mandate."  *Diamond Sawblades
Mfrs. Coal. v. United States*, 866 F.3d 1304, 1312 (Fed. Cir. 2017) ("*Diamond Sawblades*").  The
Court of Appeals rejected a plaintiff's challenge to the Department's application of the PRC-
wide entity rate when Commerce "based that rate on adverse facts available ('AFA')."  *Id.* at
1310.  *Diamond Sawblades* did not address certain questions presented by this case, including in
particular the question of whether Commerce had authority to decline to review GTC in specific
circumstances analogous to those of the eighth review of the Order.

case held that the regulation does not "grant Commerce authority to create a new kind of rate;

Commerce may determine individual rates and an all-others rate." *Id.* at __, 348 F. Supp. 3d at

1348 (citing 19 U.S.C. § 1673d(c)(1)(B)(i)(I)–(ii)).  The opinion reasoned that these two types of

rates are the only two types of rates the statute authorizes for investigations, *id.* at __, 348

F. Supp. 3d at 1345–49, and that this principle applies with equal force to reviews, *id.* at __, 348

F. Supp. 3d at 1346 n.11 (citing *Albemarle Corp. v. United States*, 821 F.3d 1345, 1352

(Fed. Cir. 2016)).

In *Thuan An Production Trading & Service Co. v United States*, 43 CIT __, 396

F. Supp. 3d 1310 (2019) ("*Thuan An II*"), this Court sustained the Department's remand

redetermination, which offered a new explanation for the Department's decision.  *Id.* at __, 396

F. Supp. 3d at 1319.  This Court noted in *Thuan An II* that on remand Commerce identified the

NME-entity rate in the underlying investigation as an individually investigated rate and specified

that this rate was revised in the tenth review of the antidumping duty order.  *Id.* at __, 396

F. Supp. 3d at 1316.  This Court reasoned that Commerce was under no obligation to review the

Vietnam-wide entity again in the twelfth review when it had not received a request to do so and

had not undertaken to self-initiate a review.  *Id.* at __, 396 F. Supp. 3d at 1317–18.  The *Thuan

An* opinions do not indicate that the plaintiff in that litigation contested the Department's

conclusion that the plaintiff could have requested a review of the Vietnam-wide entity; as

discussed later in this Opinion and Order, plaintiffs in this case argue that the Department's

regulations did not permit them to request a review of the PRC-wide entity.  GTC's Br. 50–53.

## E. On Remand, Commerce Must Reconsider Its Decision Not to Review GTC and Thereby Decline to Assign GTC Its Own Individual Dumping Margin

Plaintiffs' claims raise issues well beyond defendant's request for a voluntary remand.

As it did in the *Thuan An* litigation, Commerce must explain on remand whether Commerce

considers the PRC-wide rate it assigned to GTC to be an individual dumping margin or, alternatively, an "all-others" rate, and include its reasoning. But in light of the claims made in this litigation, Commerce also must address on remand the larger question of whether, in the circumstances of the eighth review, Commerce was (as plaintiffs argue) required to review GTC and assign GTC, as a mandatory respondent, GTC's own individual dumping margin, regardless of any treatment Commerce accorded to what it regarded as the PRC-wide entity. That question involves several issues that pertain to the Tariff Act and to the Department's regulations.

The Tariff Act requires generally that Commerce conduct a periodic review of a known exporter or producer of subject merchandise "if a request for such a review has been received." 19 U.S.C. § 1675(a)(1). Commerce nevertheless declined to review GTC, *Final I&D Mem.* at 22, a decision plaintiffs challenge in this litigation, GTC's Br. 50–53.

The Act speaks directly to the issue of how Commerce is to determine margins for exporters and producers for which a periodic review has been requested. In § 1677f–1(c), the statute sets forth a "[g]eneral rule" directing that "[i]n determining weighted average dumping margins under section 1673b(d) [applicable to the preliminary less-than-fair-value determination in the preliminary investigation], 1673d(c) [applicable to the final less-than-fair-value determination in the investigation] or *section 1675(a)* [applicable, as here, to reviews of an antidumping duty order] of this title, the administering authority shall determine the *individual weighted average dumping margin* for *each known exporter and producer* of the subject merchandise." *Id.* § 1677f–1(c)(1) (emphasis added). A related provision, 19 U.S.C. § 1673d(c)(1)(B)(i), directs Commerce, in an antidumping duty investigation, to determine "the estimated weighted average dumping margin for each exporter and producer individually investigated," *id.* § 1673d(c)(1)(B)(i)(I), and "the estimated all-others rate for all exporters and

producers not individually investigated," *id.* § 1673d(c)(1)(B)(i)(II). As plaintiffs argue, *see* GTC's Br. 8–11, and as this Court has recognized, the statute authorizes for investigations only these two types of rates, *Thuan An I*, 42 CIT at __, 348 F. Supp. 3d at 1346–49, a limitation this Court has identified as applying with equal force to reviews, *id.* at __, 348 F. Supp. 3d at 1346 n.11 (citing *Albemarle*, 821 F.3d at 1352).

The statute sets forth an "[e]xception" applicable to the general rule requiring Commerce to determine a weighted average dumping margin for each known exporter or producer. 19 U.S.C. § 1677f–1(c)(2). The exception applies only where there is a "large number of exporters or producers involved in the investigation or review." *Id.* Under this exception, Commerce "may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination" to a statistically valid sample of "exporters, producers, or types of products," *id.* § 1677f–1(c)(2)(A), or to "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined," *id.* § 1677f–1(c)(2)(B). In the eighth review, Commerce applied the exception in § 1677f–1(c)(2) to limit its individual examination to one exporter/producer (Zhongwei), chosen according to relative export volume. *Final Results*, 83 Fed. Reg. at 16,830 (citing *Prelim. Results*, 82 Fed. Reg. at 46,966). Commerce did not invoke this exception in refusing to assign an individual weighted average dumping margin to GTC.

In § 1677f–1(c), Congress addressed the circumstances in which Commerce may decide not to examine individually a known exporter or producer of the subject merchandise for which a request for review had been received. The provision does not authorize Commerce to decline to *review*, as opposed to examine individually, a known exporter or producer. Rather, the statute addresses the obligation to conduct a review in a related section, § 1675(a)(1) (directing that "the

administering authority, if a request for such a review has been received … shall— … review, and determine (in accordance with paragraph (2)) the amount of any antidumping duty." 19 U.S.C. § 1675(a)(1). Paragraph (2) imposes the general rule (to which an exception is provided in § 1677f–1(c)(2)) that Commerce must "determine—(i) the normal value and export price (or constructed export price) of each entry of the subject merchandise and (ii) the dumping margin for each such entry." *Id.* § 1675(a)(2)(A).

Interpreted according to plain meaning, the statute contemplates that Commerce, in administering § 1677f–1(c), is to derive the margins it assigns to individually examined exporter/producers from each exporter/producer's own sales, and to derive the margins it assigns to unexamined exporter/producers, or to unexamined sales transactions, from actual examinations of other exporter/producers (or transactions) that it conducts in the review. In the eighth review, Commerce did not assign GTC a rate determined in either of these two ways. Instead, Commerce concluded that GTC was not under review at all. *Prelim. Dec. Mem.* at 16-18. Commerce reasoned that GTC was part of a PRC-wide entity (having decided that GTC failed to rebut its presumption of government control), *id.* at 17, and, further, that the PRC-wide entity was not under review, no one having requested that the PRC-wide entity be reviewed, *id.* at 18; *Final I&D Mem.* at 22.

In the eighth review, Commerce apparently did not regard GTC as a known exporter or producer that it was required to review. Instead, Commerce treated the PRC-wide entity as a known exporter or producer that could be reviewed (although declining to review it) and assigned it a carry-over rate from the prior review, even though the statute does not expressly provide that such an "entity" qualifies as a "known exporter and producer of the subject merchandise," 19 U.S.C. § 1677f–1(c)(1), that Commerce is to review. Characterizing the PRC-

wide rate as "fictitious," GTC's Br. 11, and characterizing the PRC-wide entity as "fictitious" as well, *id.* at 52, plaintiffs challenge this practice as *ultra vires*. Commerce failed to explain for the Final Results how the changing PRC-wide entity could be described as a "known exporter and producer of the subject merchandise" within the meaning of 19 U.S.C. § 1677f–1(c)(1). In fact, Commerce did not expressly characterize the PRC-wide entity as a known exporter or producer of the subject merchandise. And at the time parties were authorized to request a review, the composition of the "PRC-wide entity" was not known, as the composition of the entity is subject to change in each review and determined definitively only upon completion of the review. On remand, Commerce must address this issue of statutory interpretation and respond to the argument plaintiffs make that the Tariff Act, while creating certain special provisions for nonmarket-economy countries (most notably, in the determination of normal value), did not create a special statutory mechanism applying to the method Commerce applied in the eighth review. *See* GTC's Br. 16.

As the court has noted, the Department's discussion of the treatment of the PRC-wide entity as an exporter or producer to which a PRC-wide rate could be assigned was grounded largely in existing practice rather than in specific citations to authority in the Tariff Act or its regulations. *See, e.g.*, *Prelim. Results*, 82 Fed. Reg. at 46,966; *Final I&D Mem.* at 11–12. Applying that practice in the Final Results, Commerce, as discussed in further detail below, identified only three known exporters or producers, one of which was GTC, as being components of the PRC-wide entity for purposes of the eighth review. *Final Results*, 83 Fed. Reg. at 16,830 (citing *Prelim. Results*, 82 Fed. Reg. at 46,966 n.12).

In the Initiation Notice for the review, Commerce stated that "[i]n proceedings involving non-market-economy ('NME') countries, the Department begins with a rebuttable presumption

that all companies within the country are subject to government control and, thus, should be

assigned a single antidumping duty deposit rate." *Initiation Notice*, 81 Fed. Reg. at 78,779.

Commerce then added that "[i]t is the Department's policy to assign all exporters of merchandise

subject to an administrative review in an NME country this single rate unless an exporter can

demonstrate that it is sufficiently independent so as to be entitled to a separate rate."[6]  *Id*.  In the

Preliminary Results, Commerce stated as follows:

> The Department's policy regarding conditional review of the PRC-wide
> entity applies to these reviews.  Under this policy, the PRC-wide entity will not be
> under review unless a party specifically requests, or the Department self-initiates,
> a review of the entity.  Because no party requested a review of the PRC-wide
> entity in the AR [administrative review] or NSR [new shipper review], the entity
> is not under review and the entity's rate (i.e., 105.31 percent) is not subject to
> change.  Aside from the separate rate companies discussed above, the Department
> considers all other companies for which a review was requested, including the
> mandatory respondent GTC, to be ineligible for a separate rate based on
> information provided.

*Prelim. Results*, 82 Fed. Reg. at 46,966 (footnotes omitted).  The Final Results indicated no

change in these determinations.  *See Final Results*, 83 Fed. Reg. at 16,830.

---

[6] It is unclear why Commerce described its practice as one of assigning the NME-wide rate to "all exporters of merchandise *subject to an administrative review* in an NME country" that it deems to have failed to rebut its presumption.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 78,778, 78,779 (Int'l Trade Admin. Nov. 9, 2016) ("*Initiation Notice*") (emphasis added).  This appears to be inconsistent with the Final Results, in which Commerce, rather than consider GTC to be "subject to review," refused to review GTC.  *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2015-2016*, 83 Fed. Reg. 16,829, 16,830 (Int'l Trade Admin. Apr. 17, 2018) (citing *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Rescission of New Shipper Review; 2015-2016*, 82 Fed. Reg. 46,965, 46,966 & n.12 (Int'l Trade Admin. Oct. 10, 2017) ("*Prelim. Results*")).

Commerce announced in the Initiation Notice that it had received requests for review of ten exporters and producers.[7]  Based on timely withdrawals of review requests, Commerce rescinded the review for three of the companies named in the Initiation Notice.[8]  In the Preliminary Results, Commerce stated that "[t]he administrative review covers six exporters of the subject merchandise."  *Prelim. Results*, 82 Fed. Reg. at 46,965.  The six companies remaining in the review after the partial rescission were Cheng Shin Rubber Industry Ltd. ("Cheng Shin"), Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (treated by Commerce as a single exporter/producer, "GTC"), Qingdao Milestone Tyres Co., Ltd. ("Milestone"), Qingdao Qihang Tyre Co., Ltd. ("Qihang"), Shandong Zhentai Group Co., Ltd. ("Zhentai"), and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei").  *Prelim. Results*, 82 Fed. Reg. at 46,965–66 & nn.3, 5.

The same six companies remained in the review for the Final Results.  *Final Results*, 83 Fed. Reg. at 16,830.  They consisted of three respondents Commerce designated as separate rate respondents and three to which it denied separate rate status.  *Id.*  The three separate rate companies were Zhongwei (one of the two mandatory respondents), Qihang, and Zhentai.  *Id.*

---

[7] The ten companies listed in the Initiation Notice are Cheng Shin Rubber Industry Ltd., Guizhou Tyre Co., Ltd., Guizhou Tyre Import and Export Co., Ltd., Qingdao Milestone Tyres Co., Ltd., Qingdao Qihang Tyre Co., Ltd., Shandong Zhentai Group Co., Ltd., Trelleborg Wheel Systems (Xingtai) Co., Ltd., Weihai Zhongwei Rubber Co., Ltd., Weifang Jintongda Tyre Co., Ltd., and Zhongce Rubber Group Co., Ltd.  *Initiation Notice*, 81 Fed. Reg. at 78,783.  As discussed herein, Commerce later decided to treat Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. as a single exporter/producer, *see Prelim. Results*, 82 Fed. Reg. at 46,965 n.3; therefore, nine companies can be considered to be those for which review was requested.

[8] *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Partial Rescission of the Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 16,348, 16,348 (Int'l Trade Admin. Apr. 4, 2017).  The companies listed in the notice as those for which a request for review was withdrawn are Jintongda Tyre Co., Ltd., Trelleborg Wheel Systems (Xingtai) Co., Ltd., and Zhongce Rubber Group Co., Ltd.  *Id.*

The other three were Cheng Shin, GTC (the other mandatory respondent), and Milestone.  *Id.*

Commerce decided that GTC, Cheng Shin, and Milestone (a company Commerce characterized

as "non-responsive") had not successfully rebutted the presumption of government control.  *Id.*

Commerce received a request for review of each of these three companies.  *See Initiation Notice*,

81 Fed. Reg. at 78,783.  As noted above, Commerce calculated an individual weighted average

dumping margin of 11.87% for Zhongwei and also assigned that rate to Qihang and Zhentai.

*Final Results*, 83 Fed. Reg. at 16,830.  Commerce assigned the China-wide rate of 105.31%,

carried over from the previous (seventh) and prior reviews, to Cheng Shin, GTC, and Milestone.

*Id.* at 16,831 & n.16 (citing *AR5 Final Results*, 80 Fed. Reg. at 20,199); *see also AR7 Final*

*Results*, 82 Fed. Reg. at 18,735 & n.16 (citing *AR5 Final Results*, 80 Fed. Reg. at 20,199).

Commerce has not addressed the apparent contradiction under which the PRC-wide

entity, according to Commerce, was not under review, yet the only three exporter/producers it

designated as part of that entity in the eighth review all were the subjects of requests for

review—requests that Commerce, despite the statutory directives, believed it was not required to

honor.  Plaintiffs argue that Commerce, regardless of its findings as to government control, was

obligated to determine an individual margin for GTC based on GTC's sales.  GTC's Br. 50–53.

In the Final Results, Commerce failed to explain why its findings as to potential government

control over certain specified activities of GTC, if presumed valid, sufficed to allow Commerce

to refuse to review GTC under the controlling statutory and regulatory schemes, which do not

contain provisions addressing an NME-wide entity such as that reflected in the Department's

practice.

With respect to the statutory scheme, Commerce relied for support of its practice on

section 771(18)(B)(iv)–(v) of the Tariff Act, 19 U.S.C. § 1677(18)(B)(iv)–(v).  This reliance is

misplaced.  Commerce reasoned that "[i]t is within our authority to employ a presumption of state control in an NME country and place the burden on the exporters to demonstrate an absence of central government control."  *Final I&D Mem.* at 11 (citing *Sigma Corp. v. United States*, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997)).  Commerce added that "[u]nder section 771(18)(B)(iv)-(v) of the Act, this burden is reasonable, as it recognizes the correlation between NME economies and government price control, resource allocation, and production decisions." *Id.* Because the statutory provision Commerce cites does not authorize Commerce to refuse to review an exporter or producer for which a request for review was received, it is not reasonably construed to grant Commerce authority to do what it did in this case.  Instead, the provision defines what is meant by the term "nonmarket economy country" as used in the Tariff Act, 19 U.S.C. § 1677(18)(A), and sets forth factors Commerce is to "take into account" in determining whether a foreign country conforms to that definition, *id.* § 1677(18)(B).  The statutory purpose of designating a country as a nonmarket economy country is that the normal value of that country's exports is determined in a different way than it is for exports from other countries.  *See* 19 U.S.C. § 1677b(c).  This purpose is revealed in the statutory definition of "nonmarket economy country," which is based upon the principle that sales of merchandise in an NME country, not being based on market principles, do not reflect the fair value of the merchandise.[9]

---

[9] The statutory definition is as follows:

> The term "nonmarket economy country" means any foreign country that the administering authority [Commerce] determines does not operate on market principles of cost or pricing structures, *so that sales of merchandise in such country do not reflect the fair value of the merchandise*.

19 U.S.C. § 1677(18)(A) (emphasis added).

The Department's reliance on *Sigma Corp.* to support its NME practice as applied in the eighth review, *Final I&D Mem.* at 11, is also misplaced. *Sigma Corp.* involved a challenge brought by a Chinese exporter, Guangdong Metals & Materials Import & Export Corporation ("Guangdong"), and five U.S. importers, of iron construction castings from the PRC. *Sigma Corp.*, 117 F.3d at 1404. The importers contested the final results of an administrative review of the antidumping duty order on the iron castings, "asserting that Guangdong was independent of the national Chinese corporation, China National Metals and Minerals Import and Export Corporation ('China National'), and that Commerce had therefore erred in applying a country-wide antidumping margin to Guangdong." *Id.* at 1405. The Court of Appeals for the Federal Circuit ("Court of Appeals") upheld the Department's employing a presumption of *de jure* and *de facto* government control by an NME government (in that case, China) that a respondent must rebut in order to obtain a separate rate and, upon a finding that Guangdong had not rebutted its presumption, the Department's adopting a "single country-wide margin" that would apply to all exporters. *Id.* at 1405–07.

The practice Commerce followed in the review at issue in *Sigma Corp.* is not the same practice that it followed in the Final Results at issue in this case; to the contrary, it was markedly different and, in an important respect, opposite. In the review at issue in *Sigma Corp.*, Commerce individually reviewed Guangdong, the company it found not to have rebutted its presumption, rather than refusing to do so on the ground that Guangdong was part of a PRC-wide entity that Commerce declined to review. *See Final Results of Antidumping Duty Administrative Review: Certain Iron Construction Castings From the People's Republic of China*, 57 Fed. Reg. 10,644, 10,644 (Int'l Trade Admin. Mar. 27, 1992) ("*Castings*"). Commerce assigned Guangdong an individual margin (92.74%, a margin subsequently modified

upon judicial review; *see Sigma Corp.*, 117 F.3d at 1411), based on the surrogate value method of calculating normal value for NME exporters provided for in 19 U.S.C. § 1677b(c). *Castings*, 57 Fed. Reg. at 10,648. Had Commerce followed in this case the practice it followed in *Sigma Corp.*, which the Court of Appeals affirmed, Commerce would have adopted one of the methods plaintiffs are advocating in this case, i.e., assignment of an individual margin to GTC upon review of the PRC-wide entity.

Commerce also relied on *Transcom, Inc. v. United States*, 294 F.3d 1371 (Fed. Cir. 2002) ("*Transcom*"), in support of the NME practice it employed in the eighth review. *Final I&D Mem.* at 11–12. *Transcom* held that Commerce permissibly could apply a rate based on "best information available," imposed under the previous version of 19 U.S.C. § 1677e, to Chinese exporters and producers that did not rebut the Department's presumption of government control. *Transcom*, 294 F.3d at 1373. The practice Commerce followed in the review at issue in *Transcom* also differed from the practice Commerce applied in the review at issue in this case. In the review under which the *Transcom* litigation arose, Commerce placed the PRC-wide entity under review, which it declined to do in this case. *Id.* at 1382 ("[B]ecause some of the companies specifically named in the seventh administrative review did not establish their independence from the state-controlled entity, Commerce regarded the state-controlled entity as part of the review."). Moreover, this case raises statutory and regulatory issues, as discussed in this Opinion and Order, that were not adjudicated in the *Transcom* litigation.

Regarding the regulatory scheme, the Department's practice pertaining to an NME-wide entity, as applied in the eighth review, is not provided for in the Department's regulations and, to the contrary, receives no specific mention in those regulations. In 19 C.F.R. § 351.107(d), the regulations provide that "[i]n an antidumping proceeding involving imports from a nonmarket

economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."  This regulation does not describe the current Commerce practice, under which only *some* Chinese exporters and producers (not identified definitively until the review is completed) are subjected to the PRC-wide rate.  Plaintiffs make this point in their brief.  *See* GTC's Br. 17-18.  Another provision in the regulations, 19 C.F.R. § 351.401(f) (the "collapsing" regulation), authorizes Commerce, in defined circumstances, to treat affiliated producers as a single producer.  Although deciding that GTC, Cheng Shin, and Milestone were part of the PRC-wide entity in the eighth review, *Final Results*, 83 Fed. Reg. at 16,830, Commerce did not explicitly find that these three companies were "affiliated" with each other (and to the contrary decided that GTC was legally ("*de jure*") independent from the government of China, *see Final I&D Mem.* at 12–21), nor did it decide that the criteria of the collapsing regulation had been satisfied.[10]  Even were Commerce to have decided that GTC, Cheng Shin, and Milestone should be collapsed according to § 351.401(f), the effect under that regulatory provision would not have been that Commerce could decline to review them.

While in this case, as in the review that was the subject of *Thuan An I* and *II*, Commerce declined to review the PRC-wide entity and concluded that no party requested a review of that entity, *see Final I&D Mem.* at 22, plaintiffs raise an issue not addressed in either of the *Thuan An* opinions.  That issue is whether the plaintiffs in this action validly *could have* requested a review of the PRC-wide entity under the Department's regulations.  GTC's Br. 51–53.  Plaintiffs

---

[10] During the eighth review, Commerce summarized an argument made by the petitioners by recounting that the petitioners argued that "Commerce's single-entity NME practice is analogous to its collapsing practice: in both cases, Commerce finds it necessary to treat multiple companies as a single entity for purposes of determining a dumping margin and preventing manipulation of that margin."  *Final I&D Mem.* at 11 & n.68.  Commerce did not respond to this argument.  *See id.* at 11–12.

contend that the Department's regulations did not allow them to do so. *Id.* at 52 ("Commerce has expressly confirmed [that] 'one exporter or producer may not request an administrative review of another exporter or producer.'" (quoting *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,318 (Int'l Trade Admin. May 19, 1997))). Here, as in the *Thuan An* litigation, Commerce has relied on its determination that no party requested a review of the PRC-wide entity in support of its decision to assign GTC the 105.31% PRC-wide rate. *Final I&D Mem.* at 22. But as the court discusses below, that reliance is not justified because the Department's regulations informed the plaintiffs that filing a request for a review of the PRC-wide entity was not a course of action available to them.

While the opinion in *Thuan An* does not indicate that the plaintiff in that case challenged as unlawful the Department's practice of reviewing the Vietnam-wide entity only if requested to do so, plaintiffs in this case specifically *are* challenging that practice in this litigation, *see* GTC's Br. 50–53. They argue not only that they were unauthorized by the regulations to request a review of the nonmarket economy-wide entity (the PRC-wide entity in this case) but also that Commerce could have treated GTC's request that it be reviewed in the instant proceeding as effectively a request that the PRC-wide entity be reviewed "for purposes of recalculating the PRC-wide rate in the underlying review." *Id.* at 52.

In 19 U.S.C. § 1675(a)(1), the Tariff Act provides that Commerce, on each 12-month anniversary date of the publication of an antidumping duty order, is to conduct a review and determine the amount of antidumping duty "if a request for such a review has been received." The Department's regulations, in 19 C.F.R. § 351.213(b), specify who may request a periodic administrative review of an antidumping duty order. The relevant regulations allow for a review of an antidumping duty order to be made in writing by: (1) a domestic interested party or the

foreign government of the country in which the subject merchandise was manufactured or from

which it was exported, who may request review only of specified individual exporters or

producers, 19 C.F.R. § 351.213(b)(1); (2) an individual exporter or producer covered by the

antidumping duty order, who may request review of itself but not of any other party, *id.*

§ 351.213(b)(2); and (3) an importer, who may request review of an exporter or producer of

subject merchandise that it imports, *id.* § 351.213(b)(3).  As discussed below, none of these

categories authorized a plaintiff in this case (whether a producer, exporter, or importer of the

subject merchandise) to request a review of what Commerce terms an "NME-wide entity," a type

of entity not mentioned in the regulation.  *See id.* § 351.213(b).

The Department's regulation provides that requests for a review may be made in writing

by a "domestic interested party or an interested party described in section 771(9)(B) of the Act

(foreign government),"[11] who may request review "of specified individual exporters or producers

covered by an order (except for a countervailing duty order in which the investigation or prior

administrative review was conducted on an aggregate basis), if the requesting person states why

the person desires the Secretary to review those particular exporters or producers."  *Id.*

§ 351.213(b)(1).  The plaintiffs in this action, being neither domestic interested parties nor the

government of the PRC, had no right under this provision to request a review of the PRC-wide

entity.  And even if it were presumed that GTC could submit a request for review on behalf of

the Chinese government, it could not request review of a nonspecific "entity."  The provision is

limited to requests for review of "specified individual exporters or producers."  *Id.*

---

[11] Section 771(9)(B) of the Tariff Act defines the term "interested party" to include "the government of a country in which [subject] merchandise is produced or manufactured or from which such merchandise is exported."  19 U.S.C. § 1677(9)(B).

The next paragraph in the regulation provides that "an exporter or producer covered by an order (except for a countervailing duty order in which the investigation or prior administrative review was conducted on an aggregate basis) may request in writing that the Secretary conduct an administrative review of *only that person*." *Id.* § 351.213(b)(2) (emphasis added). The regulation makes no mention of an entity comprised of an unspecified group of exporters and producers in an NME country over which Commerce, at the end of a review, determines to have conducted certain export-related activities over which the government could have exerted control or potential control. Plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (treated as one exporter/producer by Commerce, "GTC") could not invoke this provision to request a review of unidentified individual members of the China-wide entity and GTC, not being the China-wide entity itself, could not invoke this provision for the entire entity.[12]

---

[12] Later in the eighth review, Commerce decided that GTC was included in the PRC-wide entity but did not decide that GTC was the entity itself; to the contrary, Commerce found for the Preliminary Results that GTC had *de jure* independence (but not *de facto* independence) from the government. *Decision Memorandum for Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Rescission of New Shipper Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2015-2016*, at 15, 17 & n.86 (Int'l Trade Admin. Oct. 2, 2017) (P.R. Doc. 258) ("*Prelim. Dec. Mem.*") (citing *Prelim. Separate Rate Mem.*). At the time GTC could submit a request to be reviewed in the eighth review, i.e., September 2016, *see* 19 C.F.R. § 351.213(b)(2), Commerce had not decided that GTC was part of the PRC-wide entity; it did not do so until October 2017. *Prelim. Dec. Mem.* at 17.

Thus, as of the time Commerce published the Initiation Notice in November 2016, Commerce still had not decided the question of GTC's separate rate status as to the review to be initiated. *Initiation Notice*, 81 Fed. Reg. at 78,799–80. Commerce decided GTC was part of the PRC-wide entity in the previous (seventh) review, *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733, 18,735 (Int'l Trade Admin. Apr. 21, 2017), but that decision was not determinative for the eighth review, for which Commerce indicated in the November 2016 Initiation Notice that Commerce would be making the decision anew and invited listed companies, including GTC, to apply for separate rate status. *See Initiation Notice*, 81 Fed. Reg. at 78,779–80.

The Department's regulations further provide that "an importer of the merchandise may request in writing that the Secretary conduct an administrative review of *only* an exporter or producer (except for a countervailing duty order in which the investigation or prior administrative review was conducted on an aggregate basis) of the subject merchandise imported *by that importer*." *Id.* § 351.213(b)(3) (emphasis added). Plaintiffs GTC North America and Valmont, as importers of merchandise produced and exported by Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd., respectively, were not authorized by this provision, when read according to plain meaning, to request a review of the China-wide entity. Commerce did not find as a fact that the merchandise imported by these importers was exported or produced by anyone other than GTC (and had made no relevant finding as of the time review could be requested), and the provision did not notify either of these importers, in the circumstances presented here, that it could seek to place an NME-wide entity under review.

As discussed above, this Court noted in *Thuan An II* that "as Commerce explains, its current practice is to review the NME entity only when it receives a request to do so, or when it chooses to self-initiate such a review." *Thuan An II*, 43 CIT __, 396 F. Supp. 3d at 1317. In the eighth review at issue here, Commerce relied upon the same practice, stating that "[i]t is Commerce's practice to review the China-wide entity only when requested." *Final I&D Mem.* at 22. In making this statement, Commerce cited a Federal Register notice, *Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 Fed. Reg. 65,963 (Int'l Trade Admin Nov. 4, 2013) ("*Change in Practice*").

*Change in Practice* announced that Commerce no longer would consider the "NME entity to be 'conditionally' under review" in administrative reviews of antidumping duty orders involving NME countries. *Id.* at 65,964. The document states that "[i]f interested parties wish to request a review of the entity, such a request must be made in accordance with the Department's regulations." *Id.* One difficulty here is that no such request by these plaintiffs could be made "in accordance with" the regulations. *Change in Practice* did not amend, and did not state it was amending, 19 C.F.R. § 351.213(b).[13] In presuming that such a request for a review of the NME entity could be "made in accordance with the Department's regulations," *id.*, *Change in Practice* is inconsistent with 19 C.F.R. § 351.213(b).

In its response brief, defendant points to *Change in Practice* but argues, without further elaboration, that "[u]nder Commerce's regulations, interested parties must request a review of an NME-wide entity prior to the initiation of an administrative review. *See* 19 C.F.R. § 351.213(b)." Def.'s Br. 12–13. Defendant's argument does not refute plaintiffs' argument that the regulations did not allow these plaintiffs to request a review of the PRC-wide entity.

While it could be argued that *Change in Practice* is valid as a relaxation of a regulatory requirement, even without undergoing ordinary rulemaking and notice and comment procedures,

---

[13] The Preliminary Results for the eighth review echoed *Change in Practice*:

> The Department's policy regarding conditional review of the PRC-wide entity applies to these reviews. Under this policy, the PRC-wide entity will not be under review unless a party specifically requests, or the Department self-initiates, a review of that entity. Because no party requested a review of the PRC-wide entity in the AR [administrative review] or NSR [new shipper review], the entity is not under review and the entity's rate (i.e., 105.31%) is not subject to change.

*Preliminary Results*, 82 Fed. Reg. at 46,966 (footnotes omitted). The Final Results indicated no change in these determinations. *See Final Results*, 83 Fed. Reg. at 16,830; *Final I&D Mem.* at 11.

such an argument would not justify the Department's basing its decision to apply the existing PRC-wide rate to GTC on the fact that no request for review of the PRC-wide entity had been received. On the issue of whether the plaintiffs in this case were placed on adequate notice of their right to request a review of the PRC-wide entity, the regulations, not *Change in Practice*, must control where, as here, the two are in conflict. Plaintiffs, who were entitled to rely on the Department's regulation indicating to them that they had no right to request such a review, were adversely affected by the Department's refusal to review GTC. An agency must act consistently with its regulations where failure to do so would cause prejudice to an interested party. *See, e.g.*, *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010). Plaintiffs have demonstrated that Commerce acted inconsistently with its regulations and that, as a result, they incurred obvious prejudice from the loss of any opportunity for GTC to obtain a rate other than the carried-over PRC-wide rate. *See id.* Therefore, in the eighth review it was impermissible for Commerce to assign the PRC-wide rate to GTC on the proffered justification that parties (including these plaintiffs) had a right to submit a request for a review of the China-wide entity but failed to do so. *See Final I&D Mem.* at 22 (citing *Change in Practice*, 78 Fed. Reg. at 65,963).

### F. The Court Will Not Address Plaintiffs' Remaining Claim at this Time

Plaintiffs claim that in assigning GTC the rate of 105.31%, Commerce unlawfully refused to make adjustments for subsidies found in the parallel administrative review of a countervailing duty order on OTR tires from China. GTC's Br. 53–55. The court considers it premature to address this claim at this time because the issue raised by this claim may be mooted by the remand redetermination the court is ordering. Plaintiffs will be in a position to raise this

objection anew, if they consider it necessary, once that redetermination has been submitted and is before the court.

### III. Conclusion and Order

On remand, Commerce may choose to reconsider its decision on whether it considers GTC to have rebutted the Department's presumption of *de facto* government control. If upon reconsideration it decides to reverse its previous decision on that issue, then Commerce, having selected GTC as a mandatory respondent, must calculate an individual margin for GTC.

If Commerce decides not to reconsider its decision on *de facto* government control or once again decides that GTC has not rebutted its presumption, then it must decide the question of whether it is nonetheless required to review GTC. If Commerce decides that review of GTC is required in the particular circumstances of the eighth review of the Order, it must proceed on remand to determine an individual margin for GTC.

Should Commerce, on remand, consider taking the position that it is not required to review GTC, Commerce must be mindful that it is not permissible for it to rely on its earlier rationale that no party requested a review of the PRC-wide entity, a rationale inconsistent with the Department's own regulations. Defendant has not responded to plaintiffs' claims in a way that demonstrates that Commerce lawfully could refuse to review GTC in the particular circumstances of the eighth review, but because defendant has asked for a remand related to this issue, the court will reserve any decision on this issue until it is presented with the Department's position and its reasoning therefor.

In conclusion, upon consideration of the Final Results, defendant's motion and request for remand, all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that Commerce shall reconsider the Final Results as directed by this Opinion and Order and submit a new determination upon remand ("Remand Redetermination") that complies with this Opinion and Order; it is further

**ORDERED** that Commerce shall submit its Remand Redetermination within 90 days of the date of this Opinion and Order; it is further

**ORDERED** that any comments of plaintiffs on the Remand Redetermination must be filed with the court no later than 30 days after the filing of the Remand Redetermination; and it is further

**ORDERED** that any response of defendant to the aforementioned comments must be filed no later than 15 days from the date on which the last comment is filed.


   /s/ Timothy C. Stanceu
Timothy C. Stanceu, Chief Judge


Dated:   August 14, 2020
         New York, New York