Slip Op. No. 23-80

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GUIZHOU TYRE CO., LTD. AND GUIZHOU TYRE IMPORT AND EXPORT CO., LTD., et al.,** | |
| Plaintiffs, | **Before: Timothy C. Stanceu, Judge** |
| v. | **Consol. Court No. 18-00099** |
| **UNITED STATES,** | |
| Defendant. | |

## OPINION

[Sustaining an agency decision responding to court order in an action contesting the results of an administrative review of an antidumping duty order on off-the-road tires from the People's Republic of China]

Dated:  May 22, 2023

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd., Guizhou Tyre Import and Export Co., Ltd., and GTC North America, Inc.  With him on the briefs were *James C. Beaty* and *James P. Durling*.

*Richard P. Ferrin*, Faegre Drinker Biddle & Reath LLP, of Washington, D.C., for plaintiff Valmont Industries, Inc.  With him on the brief was *Douglas J. Heffner*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Jeanne D. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of counsel on the briefs was *Paul K. Keith*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Judge: In this litigation, plaintiffs contested an administrative

determination (the "Final Results") that the International Trade Administration, U.S.

Department of Commerce ("Commerce" or the "Department") issued in an

antidumping duty proceeding.  Before the court is the decision (the "Remand

Redetermination") Commerce submitted to the court in response to the court's opinion

and order in *Guizhou Tyre Co. v. United States*, 44 CIT __, 469 F. Supp. 3d 1338 (2020)

("*Guizhou I*").  *Redetermination Pursuant to Ct. Remand Order in Guizhou Tyre Co., Ltd. v.*

*United States, Consol. Ct. No. 18-00099* (Jan. 6, 2021), ECF Nos. 56 (Conf.), 57 (Public)

("*Remand Redetermination*").  The court sustains the Remand Redetermination.

## I. BACKGROUND

Background on this case is presented in the court's prior opinion and is

summarized and supplemented herein.  *See Guizhou I*, 44 CIT at __, 469 F. Supp. 3d at

1340–43.

The determination contested in this action concluded the eighth periodic

administrative review ("eighth review") of an antidumping duty ("AD") order (the

"Order") on certain off-the-road ("OTR") tires from the People's Republic of China

("China" or the "PRC").  *See Certain New Pneumatic Off-the-Road Tires From the People's*

*Republic of China: Final Results of Antidumping Duty Administrative Review and New*

*Shipper Review; 2015-2016*, 83 Fed. Reg. 16,829 (Int'l Trade Admin. Apr. 17, 2018) ("*Final*

*Results*").  Commerce incorporated by reference into the Final Results an "Issues and

Decision Memorandum" as an explanatory document.  *Issues and Decision Memorandum for the Antidumping Duty Administrative Review and New Shipper Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2015-2016* (Int'l Trade Admin. Apr. 11, 2018) (P.R. Doc. 300) ("*Final I&D Mem.*").[1]

Guizhou Tyre Co., Ltd., a Chinese producer of OTR tires, and its wholly-owned subsidiary, Guizhou Tyre Import and Export Co., Ltd., are plaintiffs in this consolidated action.  In this Opinion, the court refers to Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. collectively as "GTC."  For the eighth review, Commerce decided to treat these two companies as a single entity (an "exporter-producer"), a decision not contested here.  GTC North America, Inc., an importer of OTR tires exported by GTC and a wholly-owned affiliate of Guizhou Tyre Import and Export Co., Ltd., is also a plaintiff, as is Valmont Industries, Inc. ("Valmont"), an unaffiliated importer of tires produced by Guizhou Tyre Co., Ltd.

Commerce issued the Order in 2008.  *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Int'l Trade Admin. Sept. 4, 2008).  Commerce initiated the eighth review in November 2016, covering entries of Chinese OTR tires made during the period of review ("POR") of

---

[1] Citations to the Joint Appendix (Jan. 28, 2019), ECF Nos. 31 (Public), 32 (Conf.), are cited as "P.R. Doc. __" for references to the public version and "C.R. Doc. __" for references to the confidential version.

September 1, 2015 through August 31, 2016.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 78,778, 78,783 (Int'l Trade Admin. Nov. 9, 2016).  Commerce designated GTC as a "mandatory respondent," i.e., a respondent Commerce selected for individual examination in the eighth review.  *Id*.  Also selected as a mandatory respondent was Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei").  *Id*.

In the Final Results, Commerce concluded that GTC and two other exporter-producers failed to demonstrate independence from the PRC government and, for that reason, assigned GTC and these other two companies an AD rate of 105.31%.  *Final Results*, 83 Fed. Reg. at 16,831.  This was the rate Commerce assigned to the "PRC-wide entity" (or "China-wide entity"), which Commerce designated as a single entity comprised of those Chinese exporters of OTR tires that failed to rebut the Department's presumption of control by the PRC government.  Under the Department's practice, such companies are ineligible to receive a "separate rate," i.e., a rate separate from the rate Commerce assigns to the PRC-wide entity.  *Id*. at 16,830–31.

Concluding that Zhongwei had rebutted its presumption of government control, Commerce assigned Zhongwei an individually determined weighted average dumping margin of 11.87%.  *Id.* at 16,830.  Based on the margin it assigned to Zhongwei, Commerce assigned a rate of 11.87% to two respondents it also found to have rebutted

the presumption of government control but did not select for individual examination in the review, Qingdao Qihang Tyre Co., Ltd. and Shandong Zhentai Group Co., Ltd.  *Id*.

In contesting the Final Results, plaintiffs moved for judgment on the agency record.  Mot. for J. on the Agency R. & Br. of Pls. Guizhou Tyre Co. Ltd., Guizhou Tyre Import and Export Co., Ltd. and GTC North America, Inc. in Supp. of Mot. for J. on the Agency R. (Sept. 17, 2018), ECF Nos. 22 (Conf.), 23 (Public) ("GTC's Br."); Mot. of Consol. Pl. Valmont Indus., Inc. for J. on the Agency R. under Rule 56.2 (Sept. 17, 2018), ECF No. 24 (adopting in full the arguments in GTC's Br.).

Following two requests by defendant for remands to allow Commerce to address certain issues raised by plaintiffs' claims, and after oral argument, the court issued *Guizhou I*, remanding the Final Results to Commerce for reconsideration.  44 CIT at __, 469 F. Supp. 3d at 1358–59.  In response, Commerce, on January 6, 2021, filed the Remand Redetermination, in which it made no change to the 105.31% rate it assigned to GTC in the Final Results but changed the rationale for its decision.  *Remand Redetermination* at 31.  GTC and its affiliated importer filed a comment submission in opposition.  Comments on Final Remand Redetermination Results Pursuant to Ct. Remand (Feb. 5, 2021), ECF Nos. 62 (Conf.), 63 (Public) ("GTC's Comments").  Valmont did not comment on the Remand Redetermination.  Defendant responded to the comments, arguing that the Remand Redetermination should be sustained.  Def.'s Resp. to Comments on Remand Results (Mar. 4, 2021), ECF Nos. 66 (Conf.), 67 (Public).

## II. Discussion

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1516a (the "Tariff Act"), including an action contesting a final determination that Commerce issues to conclude an administrative review of an antidumping duty order.[2]

In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B. Plaintiffs' Claims Contesting the Final Results

Plaintiffs' challenge to the Final Results involved four claims, which are summarized below.

---

[2] All citations to the United States Code herein and all citations to the Code of Federal Regulations herein are to the 2018 editions.

### 1. Plaintiffs' Challenge to the Legal Basis for Assigning a Rate to the PRC-Wide Entity

Plaintiffs challenged the practice Commerce applies when the subject

merchandise is exported from a non-market economy ("NME") country, such as China.

As the court in *Guizhou I* described the first claim, "[p]laintiffs, in effect, challenge the

legal basis for the Department's practice of determining and assigning a rate for the

PRC-wide entity as applied in the eighth review." 44 CIT at __, 469 F. Supp. 3d at 1344.

Plaintiffs relied on Section 735(c)(1)(B)(i) of the Tariff Act, 19 U.S.C. § 1673d(c)(1)(B)(i),

in arguing that the Tariff Act "does not empower Commerce to write a whole new type

of AD margin from scratch for non-market economies." *Id.* (citation omitted). Plaintiffs

maintain that "in an antidumping duty proceeding (as opposed, specifically, to a

countervailing duty proceeding), the statute confines Commerce to assigning

respondents either an individually determined margin or an 'all-others' rate, and that

the rate Commerce determined for the PRC-wide entity and assigned to GTC falls into

neither of these categories." *Id*. (citation omitted).

Defendant asked for a remand "for Commerce to reconsider its explanation of its

statutory authority to apply NME-wide rates in light of this Court's findings in *Thuan

An*." *Id*., 44 CIT at __, 469 F. Supp. 3d at 1347 (citing *Thuan An Production Trading &

Service Co. v. United States*, 42 CIT __, 348 F. Supp. 3d 1340 (2018) ("*Thuan An I*")). In

*Thuan An I*, this Court remanded to Commerce the final results of an administrative

review of an antidumping duty order on certain frozen fish fillets from Vietnam, an

NME country.  The court in *Guizhou I* noted that this Court, in *Thuan An Production*

*Trading & Service Co. v. United States*, 43 CIT __, 396 F. Supp. 3d 1310 (2019) ("*Thuan*

*An II*")), "sustained the Department's remand redetermination, which offered a new

explanation for the Department's decision." *Guizhou I*, 44 CIT at __, 469 F. Supp. 3d

at 1348 (citing *Thuan An II*, 43 CIT at __, 396 F. Supp. 3d at 1319).

### 2. Plaintiffs' Claim that GTC Was Entitled to a Rate Based on Its Own Sales

Plaintiffs' second claim was that even were Commerce presumed to have

authority to invent a new type of rate for the PRC-wide entity, it still would be unlawful

for Commerce to carry over the 105.31% rate from prior reviews (which was derived in

part from "facts otherwise available" and an "adverse inference" (collectively, "adverse

facts available" or "AFA"), determined under Section 776 of the Tariff Act, 19 U.S.C.

§ 1677e), and apply it to GTC, a fully cooperative respondent.  "They argue that

Commerce, even under such a presumption, would have been required to calculate a

new rate for the PRC-wide entity in the eighth review and was required to do so using

GTC-specific data." *Guizhou I*, 44 CIT at __, 469 F. Supp. 3d at 1344 (citation omitted).

In support of their second claim, plaintiffs "take issue with the Department's

rationale for not reviewing the PRC-wide entity, which was that no review of the

PRC-wide entity was requested." *Id*. (citation omitted).  For the Final Results,

Commerce based its justification for assigning GTC the PRC-wide rate partly on a

conclusion that no party requested that Commerce review the PRC-wide entity when

conducting the eighth review of the Order.  *Id*., 44 CIT at ___, 469 F. Supp. 3d at 1355

(citing *Final I&D Mem*. at 22).

### 3.  Plaintiffs' Challenge to the Determination that GTC Was Subject to Government Control

Plaintiffs' third claim is that "Commerce erred in concluding that GTC had not

put forth information establishing independence from the Chinese government and,

specifically, in determining that the government of the PRC controls GTC's export

activities."  *Id*., 44 CIT at ___, 469 F. Supp. 3d at 1344 (citation omitted).  "They argue that

in making these determinations, Commerce did not follow the correct criteria . . .  and

reached a determination unsupported by substantial evidence on the record of the

review."  *Id*. (citations omitted).

### 4.  Plaintiffs' Challenge to the Calculation of the 105.31% Margin Assigned to GTC

Plaintiffs' final claim is that in assigning GTC the rate of 105.31%, Commerce

"unlawfully refused to make adjustments" for domestic and export subsidies found in

the parallel administrative review of a countervailing duty order on off-the-road tires

from the PRC.  *Id*., 44 CIT at ___, 469 F. Supp. 3d at 1344–45 (citation omitted).

### C.  The Court's Opinion and Order in *Guizhou I*

The court in *Guizhou I* addressed the first three of plaintiffs' claims, remanding

the Final Results to Commerce with respect to them and deferred any ruling on the

remaining claim.  *Id*., 44 CIT at ___, 469 F. Supp. 3d at 1358 ("The court considers it

premature to address this claim at this time because the issue raised by this claim may
be mooted by the remand redetermination the court is ordering.").

Addressing plaintiffs' first two claims, and the government's request for a
remand as to those claims, the court in *Guizhou I* directed Commerce to reconsider its
decision not to review, and therefore not individually examine, GTC and on that basis
decline to assign GTC a margin based on its own sales. *Id*. The court cited the "general
rule" in Section 777A(c)(1) of the Tariff Act, 19 U.S.C. § 1677f-1(c)(1), that Commerce
must determine an individual weighted average dumping margin for each known
exporter and producer of the subject merchandise. *Id*., 44 CIT at __, 469 F. Supp. 3d at
1349–50. The court also mentioned that the statutory exception to that rule, 19 U.S.C.
§ 1677f-1(c)(2), which allows Commerce to determine individual margins for fewer than
all known exporters and producers due to the "large number" of such exporters and
producers, did not apply here, Commerce itself having selected GTC as one of the two
mandatory respondents in the review. *Id*. The court noted that in the eighth review
Commerce concluded that GTC was not under review, reasoning that it was part of the
PRC-wide entity, for which, Commerce concluded, no review had been requested. *Id*.
The court in *Guizhou I* stated that 19 U.S.C. § 1677f-1(c) does not authorize Commerce
"to decline to *review*, as opposed to examine individually, a known exporter or
producer" for which a review had been requested in a related section of the Tariff Act,
19 U.S.C. § 1675(a)(1). *Id*.

The court in *Guizhou I* distinguished plaintiffs' claim from the claim adjudicated in the *Thuan An* cases, explaining that the opinions in those cases "do not indicate that the plaintiff in that litigation contested the Department's conclusion that the plaintiff could have requested a review of the Vietnam-wide entity" and that "plaintiffs in this case argue that the Department's regulations did not permit them to request a review of the PRC-wide entity." *Id.*, 44 CIT at __, 469 F. Supp. 3d at 1348 (citation omitted). Upon analyzing the applicable regulation, 19 C.F.R. § 351.213(b), the court in *Guizhou I* agreed with plaintiffs, concluding that the regulation did not include parties in GTC's position among those who could request a review of a party other than itself. *Id.*, 44 CIT at __, 469 F. Supp. 3d at 1355. Pointing to § 351.213(b)(2) in particular, the court concluded that GTC "could not invoke this provision to request a review of unidentified members of the China-wide entity and GTC, not being the China-wide entity itself, could not invoke this provision for the entire entity." *Id.*, 44 CIT at __, 469 F. Supp. 3d at 1356 (footnote omitted).

Based on the plain meaning of 19 C.F.R. § 351.213(b), the court in *Guizhou I* ruled that "in the eighth review it was impermissible for Commerce to assign the PRC-wide rate to GTC on the proffered justification that parties (including these plaintiffs) had a right to submit a request for a review of the China-wide entity but failed to do so." *Id.*, 44 CIT at __, 469 F. Supp. 3d at 1358 (citations omitted). The court directed Commerce to address the question of "whether, in the circumstances of the eighth review,

Commerce was (as plaintiffs argue) required to review GTC and assign GTC, as a

mandatory respondent, GTC's own individual dumping margin, regardless of any

treatment Commerce accorded to what it regarded as the PRC-wide entity." *Id.*, 44 CIT

at __, 469 F. Supp. 3d at 1348–49.  The court in *Guizhou I* concluded that "[d]efendant

has not responded to plaintiffs' claims in a way that demonstrates that Commerce

lawfully could refuse to review GTC in the particular circumstances of the eighth

review." *Id.*, 44 CIT at __, 469 F. Supp. 3d at 1358–59.  The court added that "but

because defendant has asked for a remand related to this issue, the court will reserve

any decision on this issue until it is presented with the Department's position and its

reasoning therefor." *Id.*, 44 CIT at __, 469 F. Supp. 3d at 1359.

In *Guizhou I*, the court remanded the agency decision contested in plaintiffs' third

claim—i.e., that GTC failed to rebut the presumption of government control—in

response to defendants' request.  Commerce supported that decision, in part, with a

finding that GTC elected members of its board of directors through a shareholder's

meeting that was not available to all shareholders, a finding GTC disputed and for

which defendant requested that Commerce be given an opportunity to reconsider.  *Id.*,

44 CIT at __, 469 F. Supp. 3d at 1346.  The court directed Commerce to reconsider in the

entirety the determination that GTC had failed to rebut the presumption of government

control, directing that "[i]f Commerce determines that GTC has rebutted its

presumption of government control, it must assign GTC, which Commerce selected as a

mandatory respondent, an individual weighted average dumping margin." *Id.*, 44 CIT

at __, 469 F. Supp. 3d at 1347.

### D.  The Department's Remand Redetermination in Response to *Guizhou I*

In the Remand Redetermination, Commerce made no change to the 105.31% rate

to be applied to GTC's subject merchandise but put forth a different rationale for its

decision not to assign to GTC an individual weighted average dumping margin.

Reversing its previous position that GTC did not qualify for a review, Commerce now

asserted that in fact it had conducted a review of GTC, describing as a "review" its

determining that GTC had failed to rebut the presumption of government control, but

maintained its earlier position that the PRC-wide entity was not under review.  *Remand*

*Redetermination* at 15–16.  Also, as discussed below, Commerce now agreed with

plaintiffs, and with the court's holding in *Guizhou I*, that individual respondents such as

GTC were precluded by the Department's regulation from requesting a review of the

PRC-wide entity.  *Id.* at 22.

### 1.  The Finding of Government Control of GTC's Export Functions

The Remand Redetermination stated that in determining whether a respondent

has rebutted its presumption of government control over its export functions,

"Commerce typically considers four factors," as follows:

1.  Whether the export prices are set by or are subject to the approval of a
    government agency;

2. Whether the respondent has authority to negotiate and sign contracts and other agreements;

3. Whether the respondent has autonomy from the government in making decisions regarding the selection of management; and

4. Whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

*Id.* at 4–5 n.17 (citations omitted).  Commerce took the position that all four factors must be met in order for a respondent to rebut the Department's presumption.  *Id.* at 5 n.18 (citation omitted).  As discussed below, Commerce concluded that the third factor was not satisfied and, with respect to the fourth factor, also found that GTC did not have independent control of the distribution of profits.

Commerce found "that GTC is not free from government control in making decisions regarding the selection of its management and thus is subject to *de facto* government control of its export functions."  *Id.* at 4–5 (footnotes omitted).  Commerce cited record evidence that the Guiyang State-owned Assets Supervision and Administration Commission ("Guiyang SASAC"), through its 100-percent-owned affiliate, Guiyang Industry Investment Group Co., Ltd. ("GIIG"), held 25.33% of GTC's shares during the POR.  *Id.* at 3–5 (citing *GTC's First Supplemental Section A Response* at Ex. SA-3 (June 16, 2017) (C.R. Docs. 240–248) ("*SAQR*")).  Commerce found that "GIIG is 100 percent owned and supervised by Guiyang SASAC" and inferred that "through its large ownership stake, GIIG can control, and has an interest in controlling, the

operations of GTC, including the selection of management and the profitability of the

company." *Id*. at 5 (citing *Section A Questionnaire Response* at 3–4 & Ex. A-1 (Feb. 7, 2017)

(P.R. Docs. 57, 59–61, 63–66) (C.R. Docs. 11, 21, 22–33, 37–38) ("*AQR*")).  Commerce

found, further, that the next nine shareholders held only a combined 4.7% share, *id*. at 3

(citing *SAQR* at Ex. SA-3), and that no individual shareholder other than GIIG held

even a one percent ownership share, *id*. at 6 (citing *AQR* at Ex. A-1).

Commerce considered the position of GIIG within GTC's ownership structure to

be significant in light of GTC's Articles of Association ("AoAs"), according to which,

Commerce found, "GIIG is able to exert control through shareholders' meetings, the

selection of directors, and in turn, the selection of the chairperson." *Id*.  Commerce

further found that "because GIIG is the only shareholder with more than three percent

of shares, GIIG is the only shareholder with the requisite shares to individually put

forward proposals for consideration at shareholders' meetings, pursuant to Article 54 of

GTC's AoA's." *Id*. (citing *AQR* at Ex. A-2).  Commerce noted that Article 83 of the AoAs

"states that the list of candidates for directors and supervisors shall be based upon

proposal/motion at the shareholders' general meeting." *Id*. (citing *AQR* at Ex. A-2).

Commerce also found that the AoAs provide that "the board of directors shall appoint

or remove GTC's general manager and four deputy general managers." *Id*. at 7–8

(citing *AQR* at Ex. A-2).  Therefore, GTC, according to Commerce, did not have

autonomy in the selection of management due to the control of the board of directors

over senior management selection. *Id.* at 8–9.  Commerce also found that the AoAs, in

Article 161 (IV), allowed GIIG to affect the company's distribution of profits. *Id.* at 8

(citing *AQR* at Ex. A-2).  In summary, the Department's principal findings supporting

the conclusion that the presumption was unrebutted were that GIIG effectively had

control over the composition of GTC's board of directors and the selection of its

chairperson and that the board, having the authority to appoint or remove GTC's

general manager and four deputy general managers, also could control the selection of

management. *Id.* at 9 ("GTC's board is responsible for the selection of senior

management, which controls the operations of the company including the company's

export activity.").

As they did in contesting the Final Results, GTC and its affiliated importer raise a

general objection to the methodology Commerce used in the Remand Redetermination,

which did not ground the determination in all four of the factors Commerce identified

for deciding whether a respondent rebutted the presumption of *de facto* government

control of its export functions. *See* GTC's Comments 6–8.  These plaintiffs do not

convince the court that Commerce acted impermissibly in requiring a respondent to

demonstrate independence as to all four of its factors and, in this instance, in basing its

decision on only two of them.

The Department's use of its rebuttable presumption of *de facto* government

control by the Chinese government does not effectuate any specific provision of the

Tariff Act or the Department's regulations.  *See*, *e.g.*, *Jilin Forest Indus. Jinqiao Flooring*

*Grp. Co. v. United States*, 47 CIT __, __, 617 F. Supp. 3d 1343, 1356 (2023).  As a result,

there is no statutory language, legislative history, or regulatory language or preamble to

serve as guidance under which the court may disallow the Department's methodology

as *ultra vires* or unreasonable *per se*.  At the same time, the court is guided by binding

precedent of the Court of Appeals for the Federal Circuit ("Court of Appeals"), which

repeatedly has affirmed the Department's authority to apply a rebuttable presumption

of government control, even to a cooperative mandatory respondent such as GTC.

*China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1039 (Fed. Cir. 2021) ("*CMA*");

*Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017)

("*Diamond Sawblades*").  Commerce, therefore, must be allowed broad discretion in

selecting the methodology by which it interprets and effectuates its presumption of

government control over export functions.  The breadth of this discretion requires the

court to reject these plaintiffs' general objection to the methodology Commerce applied

in the Remand Redetermination, which placed substantial weight on the ability of a

single, government-owned shareholder to control the selection of board members and

company management.

  GTC and its importer also argue that Chinese domestic law limits "the rights of

shareholders with a majority or controlling interest" and "grant[s] certain rights of

supervision and control to minority shareholders."  GTC's Comments 4–5 (citation

omitted).  Responding to findings by Commerce that GIIG was able to dominate GTC's decision-making process and appoint its preferred members to GTC's board, they submit that "Commerce fails . . . to confront important contrary record evidence or show how the events it identifies lead to the conclusion that GIIG is acting in a manner that would cause GTC to export subject merchandise to the United States at distorted prices."  *Id*. at 5.

They argue, further, that Commerce ignored evidence that GIIG's level of control over the selection of board members "did not result in control of management."  *Id*. at 7. They point to evidence of management autonomy from the board of directors in making certain types of ordinary business decisions (for which they claim confidentiality as to the specific content).[3]  *Id*. (citing *AQR* at Ex. A-9).  In so doing, GTC and its importer direct their argument to the question of control over ordinary business decisions of a type that would be expected to be the province of management, not the board of directors.  GTC and its importer validly may object that Commerce did not cite record evidence that GIIG or the board exerted effective control over such day-to-day decisions, but that objection is insufficient for the court to disallow the Department's ultimate conclusion that GTC did not rebut the presumption of government control of

---

[3] The court has not included in this Opinion the specific record information concerning those types of decisions but notes that the claim of confidentiality appears to be unsubstantiated; i.e., it does not appear that public disclosure could result in harm to any party's competitive position or otherwise be injurious to its business interests.

the company's export functions.  An agency may draw reasonable inferences from the record evidence considered as a whole.  *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 845 (Fed. Cir. 2020) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) for the principle that "substantial evidence includes 'reasonable inferences from the record'").  In this case, the record evidence pertaining to the ownership structure, where no shareholder other than GIIG held even a one percent share, and to the Articles of Association, supported a finding that a governmental entity, alone among all shareholders, had the power to control the selection of the board and the selection of senior management.[4]

From the record evidence and the findings of fact it supported, Commerce reasonably could infer that GTC's management would be influenced by the governmental entity in their day-to-day business decisions, having owed their appointment to, and being subject to removal by, the board of directors.  In short, Commerce was permitted to draw the inference from ownership structure and the AoAs that GTC's management, while having some autonomy over the day-to-day operations, had not been demonstrated to be independent of the overall influence of the company's largest, government-owned, shareholder.  Based on its methodology, according to which GTC was required to satisfy all four factors of the Department's test,

---

[4] The court does not hold or imply that a 25.33% ownership share by a government-owned shareholder that is the largest shareholder is by itself sufficient to support a finding of government control over selection of management.

and on the record evidence, Commerce permissibly determined that GTC failed to demonstrate independence from "*de facto* government control of its export functions." *Remand Redetermination* at 4–5 (citation omitted).

### 2. Authority to Assign the PRC-Wide Rate to GTC

The Remand Redetermination responded to the directive in *Guizhou I* that Commerce, even if concluding that GTC failed to establish independence from government control, decide whether the Tariff Act required the assigning of an individual weighted average dumping margin to GTC in the circumstances of the eighth review. Commerce decided, once again, to assign GTC the PRC-wide rate of 105.31% instead of a rate based on an examination of GTC's own sales. In doing so, Commerce employed different reasoning than it put forth in support of the Final Results. As discussed above, the court in *Guizhou I* rejected one of the reasons Commerce offered for why it was permissible to assign GTC the China-wide rate of 105.31%, which was that no party requested a review of the China-wide entity. *Guizhou I*, 44 CIT at __, 469 F. Supp. 3d at 1355. The court concluded in *Guizhou I* that the Department's regulation, 19 C.F.R. § 351.213(b), did not allow GTC to do so. *Id.*, 44 CIT at __, 469 F. Supp. 3d at 1356.

In the Remand Redetermination, Commerce agreed with the court's conclusion in *Guizhou I* that, according to 19 C.F.R. § 351.213(b), only a domestic interested party or the government of China, but not a foreign exporter/producer such as GTC, was eligible

to request a review of the PRC-wide entity.  *Remand Redetermination* at 22.  The Remand

Redetermination also states: "That Commerce's regulations do not provide exporters or

producers with the ability to request a review of the NME-entity as a whole does not

result in prejudice to the exporters or producers."  *Id*.  Commerce reasoned that GTC

was not prejudiced because it was, in fact, "reviewed."  *Id*. ("[W]e conducted a review

of GTC, and as part of that review we determined GTC to be a part of the China-wide

entity, which resulted in our assigning GTC the China-wide entity rate.").

        The court disagrees with the Department's conclusion that GTC was not

prejudiced by its inability to request a review of the PRC-wide entity.  Under the

Department's methodology, a review of the PRC-wide entity potentially would have

allowed GTC to obtain a rate different than the 105.31% rate it was assigned, based on

record data in the eighth review, including its own data.

        The court also is unconvinced by the Department's reasoning that GTC was not

prejudiced because it was, in fact, reviewed.  A "review" conducted under Section 751

of the Tariff Act, 19 U.S.C. § 1675(a), is not the statutory equivalent of an individual

examination conducted according to Section 777A(c)(1) of the Tariff Act, 19 U.S.C.

§ 1677f-1(c)(1).  Thus, under the Tariff Act, a "reviewed" respondent is not necessarily

an individually examined respondent.  Commerce neither allowed GTC to obtain a

review based on an individual examination of its own sales nor allowed GTC to request

a review based on an examination of all the sales made by the PRC-wide entity, which

Commerce treated as a single exporter, yet one that was beyond the scope of any review

request that GTC could submit under § 1675(a).[5]

Even though GTC was prejudiced by its inability to request a review of the PRC-

wide entity, the Department's statement to the contrary does not suffice to require the

court to issue a second remand order to Commerce.  Guizhou and its importer make

several arguments in objecting to the assignment of the PRC-wide rate to GTC, but they

present all of these arguments as grounds in support of the same claim: that Commerce

was required by statute to treat GTC as a separate rate respondent, i.e., one that must be

assigned either an individual dumping margin or an all-others rate.  *See* GTC's

Comments 15 (arguing that GTC was "under review and thus eligible for either an

individually examined rate or an all-others rate").  They do not claim, in the alternative,

that the court should issue a second remand order directing Commerce to review the

_____

[5] In *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 47 CIT __, 617
F. Supp. 3d 1343 (2023) ("*Jilin*"), the Court of International Trade recently rejected a
rationale by Commerce that was similar in certain respects to the one Commerce offered
in decision at issue, *Redetermination Pursuant to Ct. Remand Order in Guizhou Tyre Co.,
Ltd. v. United States, Consol. Ct. No. 18-00099* at 17 (Jan. 6, 2021), ECF Nos. 56 (Conf.), 57
(Public).  As stated in *Jilin*:

> While Commerce may apply facts available or adverse facts available
> to a mandatory respondent when certain conditions are met (*e.g.*, to fill gaps
> in the record of necessary information), the statute does not indicate that
> Commerce can simply assign a rate to a mandatory respondent based on its
> relationship to an NME government.

*Id.*, 47 CIT at __, 617 F. Supp. 3d at 1353 (citing 19 U.S.C. § 1677e).

PRC-wide entity.  Nor do they claim that the Department's regulation, 19 C.F.R.

§ 351.213(b), should be declared invalid as contrary to the Tariff Act, with the result that

the court now must order Commerce to place the PRC-wide entity under review.  As

the court discusses below, binding precedent of the Court of Appeals forecloses relief

on these plaintiffs' claim that GTC, even if failing to rebut the presumption of

government control, is entitled to a separate rate.

In its comments opposing the Remand Redetermination, GTC and its importer

assert the "absence of a statutory basis for applying a PRC-Wide rate to a cooperating

company under review." *Id*. at 9.  They present two arguments in support of this

position.

Plaintiffs argue, first, that the PRC-wide rate could not be applied lawfully to

GTC because it is neither an "all-others" rate as provided for in 19 U.S.C.

§ 1673d(c)(1)(B)(i)(II), *id*. at 11, nor an "individually investigated" rate as provided for in

19 U.S.C. § 1673d(c)(1)(B)(i)(I), Commerce not having individually examined the PRC-

wide entity in the eighth review, *id*. at 10.  They maintain that Commerce impermissibly

confined its procedure to "carrying over a rate from a prior period with different

respondents, different market conditions, and different volumes and prices of sales of

subject merchandise." *Id*.

The court is not persuaded by this first argument because the Court of Appeals

rejected essentially the same argument in *CMA*, 1 F.4th at 1037, a decision issued after

Commerce filed the Remand Redetermination in this proceeding and after the

submission of comments thereon.  *CMA* arose from the fifth review of the same

antidumping duty order that was at issue in this proceeding; in fact, it was in the fifth

review that Commerce originally determined the 105.31% rate for the PRC-wide entity,

which Commerce continued to carry forward and assigned to GTC in the eighth review.

The Court of Appeals noted that Commerce based its initial PRC-wide rate in the

original investigation on facts otherwise available and an adverse inference, on the

ground that only thirty of ninety-four identified Chinese exporters of the subject

merchandise responded to the Department's quantity and value questionnaire.  *CMA*,

1 F.4th at 1037 ("The PRC-wide entity rate resulting from Commerce's initial

investigation constitutes an 'individually investigated' weighted average dumping

margin within the meaning of § 1673d(c)(1)(B)(i)(I) because 'Commerce treats the

companies comprising the China-wide entity as a single entity and investigated them as

such in the original investigation.'" (quoting Appellant's Reply Br.)).  Reasoning that no

"additional investigation" by Commerce "into the country-wide entity is required in

order to comport with the statute in carrying this investigated rate forward into later

administrative review proceedings," *id.*, the Court of Appeals concluded in *CMA* that

"[w]e now confirm that the resulting country-wide NME entity rate may be an

'individually investigated' rate within the meaning of 19 U.S.C. § 1673d(c)(1)(B)(i)(I),

which Commerce may determine using its ordinary techniques of investigation," *id*.,

1 F.4th at 1039.

Two facts underlying the Department's assigning the PRC-wide rate to GTC in

the eighth review and the Remand Redetermination parallel those of *CMA*.  Like GTC,

the exporter in the antidumping review at issue in *CMA*, Double Coin Holdings Ltd.

("Double Coin"), fully cooperated in the administrative review; also, like GTC, Double

Coin was selected by Commerce as a mandatory respondent.  The Court of Appeals

considered those two facts to be insufficient to qualify Double Coin for an individual

weighted average dumping margin under 19 U.S.C. § 1677f-1(c)(2).

GTC and its importer base their second argument on the court's holding in

*Guizhou I* that "it was impermissible for Commerce to assign the PRC-wide rate to GTC

on the proffered justification that parties (including these plaintiffs) had a right to

submit a request for a review of the China-wide entity but failed to do so."  GTC's

Comments 14 (quoting *Guizhou I*, 469 F. Supp. 3d at 1358).  According to their

argument, "[t]hat is, however, exactly what Commerce has offered this Court as its

justification" in the Remand Redetermination.  *Id*. at 15.  In their view, "Commerce has

failed to grapple with the essential question posed by it to this Court" and "[i]f GTC

was under review and thus eligible for either an individually examined rate or an all-

others rate it could not be assigned a rate that reflects a notional entity of which it was

not a part and was not eligible to request a review of."  *Id*.  They maintain that

"Commerce['s] remand results do nothing to resolve this discrepancy between the strictures of the statute and Commerce's practices regarding its implementation of the regulations." *Id*.  In other words, they rely on their inability to request a review of the PRC-wide entity as one of the reasons why, in their view, the court now must order Commerce to treat GTC as a separate rate respondent, i.e., an exporter or producer that is "eligible for either an individually examined rate or an all-others rate." *Id*.  The court must reject this argument.

The binding precedents of *CMA* and *Diamond Sawblades* preclude the court from ordering any remedy on these plaintiffs' claim that GTC, even if found not to have rebutted the presumption of government control, must be treated as a separate rate respondent.  In *CMA*, the Court of Appeals stated that its prior precedents "uniformly sustained Commerce's recognition of an NME-wide entity as a *single exporter* for purposes of assigning an antidumping rate to the individual members of the entity." *CMA*, 1 F.4th at 1036–37 (citing *Michaels Stores, Inc. v. United States*, 766 F.3d 1388, 1390–91 (Fed. Cir. 2014)) (emphasis added).  The necessary implication of the principle applied by the Court of Appeals is that an individual respondent such as GTC, even if a mandatory respondent, is not itself a "known exporter or producer" within the meaning of 19 U.S.C. § 1677f-1(c) unless it rebuts the presumption of government control.  Under the holdings in *CMA* and *Diamond Sawblades*, that is so even though the respondent is a "reviewed" exporter or producer for purposes of an administrative

review of an antidumping duty order conducted under 19 U.S.C. § 1675(a) and 19 C.F.R.

§ 351.213(b)(2) (". . . an exporter or producer covered by an [antidumping duty] order

. . . may request in writing that the Secretary [of Commerce] conduct an administrative

review of only that person."). Thus, under the Department's methodology, the PRC-

wide entity, and not GTC, is the actual "known exporter or producer," within the

meaning of that term as used in 19 U.S.C. § 1677f-1(c), of the merchandise GTC exported

to the United States during the POR. But in commenting on the Remand

Redetermination, these plaintiffs, who claim that GTC must be treated as a separate rate

respondent, do not seek a review of the PRC-wide entity. *See* GTC's Comments 15.

The court next considers whether Commerce is required by the circumstances of

this case to assign a new rate for the PRC-wide entity that is based partly on the

individual sales data of GTC. If so, the court would issue a second remand order

directing Commerce to consider that question.

*CMA* and *Diamond Sawblades* held that Commerce acts within its broad discretion

when it decides that a redetermined rate for a PRC-wide entity may be based in part on

a pre-existing, AFA-based rate. *CMA*, 1 F.4th at 1038 (citing *Dongtai Peak Honey Industry

Co. v. United States*, 777 F.3d 1343, 1356); *Diamond Sawblades*, 866 F.3d at 1314–15.

Referring to its previous decision in *Diamond Sawblades*, the Court of Appeals stated in

*CMA* that "[i]n that case, as in this case, Commerce did not review the composition of

the PRC-wide entity, or data particular to the exports of members of the PRC-wide

entity, but did review the PRC-wide rate." *CMA*, 1 F.4th at 1038 (citing *Diamond Sawblades*, 866 F.3d at 1309). Commerce reached an analogous result in the fifth review of the Order, which *CMA* affirmed.

Both *CMA* and *Diamond Sawblades* arose from the Department's assigning the mandatory respondent a new rate calculated for the PRC-wide entity by averaging the respondent's rate, determined in the review from the respondent's own data, with a rate for the PRC-wide entity that was carried forward from the prior review. *See CMA*, 1 F.4th at 1038 ("Commerce determined that the proper PRC-wide entity rate for the fifth annual review is a simple average of the carried-forward AFA-based PRC-wide rate of 210.48% and Double Coin's 0.14% investigated rate, for a PRC-wide rate 105.31%); *Diamond Sawblades*, 866 F.3d at 1309 (explaining that Commerce determined a new PRC-wide rate by averaging the carried-forward PRC-wide rate of 164.09% with the calculated final margin for the respondent, 0.15%, to yield a new PRC-wide entity rate of 82.12%). In *Diamond Sawblades*, the Court of Appeals opined that "the fact of cooperation may help an entity in a NME country seek a reduction of the country-wide rate, as it did here, but it does not, without more, save it from that rate." *Diamond Sawblades*, 866 F.3d at 1315. Nevertheless, the court concludes that a second remand to direct Commerce to consider a redetermined rate for the PRC-wide entity is not warranted in this case, for two reasons.

First, plaintiffs waived the opportunity to challenge the Remand

Redetermination on a claim that Commerce should have averaged an individually

determined rate with the PRC-wide rate and applied the result to GTC.  GTC and its

importer filed comments on the Remand Redetermination on February 5, 2021, which,

although occurring before the Court of Appeals decided *CMA* later that year, was after

the August 7, 2017 date the Court of Appeals decided *Diamond Sawblades*.  The *Diamond*

*Sawblades* opinion placed them on notice that, while claiming that GTC must have its

own individual margin, they also could have claimed in the alternative that any PRC-

wide rate applied to GTC should have been derived through a methodology that

reflected, in part, GTC's own data.  As the *Diamond Sawblades* opinion explained, a

cooperating respondent that is part of the country-wide entity, under the Department's

methodology, could "seek a reduction of the country-wide rate."  *Id*.

Instead, GTC and its importer made only two claims in their February 5, 2021

comment submission to the court: that GTC had rebutted the presumption of

government control over its export functions, GTC's Comments 3–8, and that,

regardless of whether it had done so, Commerce was prohibited by the Tariff Act from

"applying a PRC-Wide rate to a cooperating company under review," *id*. at 9.

Throughout the comment submission, these plaintiffs directed their arguments to a

claim that GTC qualified for a separate rate.  Nowhere does the submission claim in the

alternative that even were Commerce presumed to have the authority to assign GTC a

rate for the PRC-wide entity, Commerce first was required to recalculate the PRC-wide

rate by averaging it with a rate based on GTC's sales.  Any such argument is, therefore,

waived.

Second, the court does not interpret the holding of *CMA* or of *Diamond Sawblades*

to require the court, *sua sponte*, to remand a decision (such as the Remand

Redetermination at issue here) to direct Commerce to consider averaging the carried-

forward rate with an individually-determined rate before applying it to a respondent

that did not seek that remedy.[6]  *CMA* and *Diamond Sawblades* hold that Commerce may

assign the NME country-wide rate, rather than a separate rate, to a nonmarket economy

country respondent, even a fully-cooperating mandatory respondent, that failed to

rebut the presumption of government control.  That is what Commerce did in the

Remand Redetermination.[7]

---

[6] In neither of the cases did the Court of Appeals for the Federal Circuit ("Court of Appeals") decide the issue of whether the "simple average" method employed by Commerce to redetermine the PRC-wide rate was reasonable, as the parties in those cases did not raise that issue on appeal.  *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1038 n.8 (Fed. Cir. 2021) ("*CMA*"); *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1309 n.3 (Fed. Cir. 2017).

[7] In addition to *CMA*, another precedential decision of the Court of Appeals, *YC Rubber Co. (North America) LLC v. United States*, No. 21-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022) ("*YC Rubber*"), was decided after the briefing on the Remand Redetermination was completed and potentially affects dumping margins in proceedings such as this one.  In the review at issue here, Commerce assigned the rate of 11.87% to the reviewed, but unexamined, separate rate respondents even though it determined that rate based on the dumping margin of only one individually examined (continued . . .)

### 3.  Adjustment of the 105.31% Rate for Domestic and Export Subsidies

Plaintiffs claimed that Commerce was required by 19 U.S.C. § 1677f-1(f)(1) to

make a countervailing duty "double counting" adjustment to the rate applied to GTC to

account for domestic subsidies determined in parallel countervailing duty proceedings.

GTC's Br. 54 (citing *Certain New Pneumatic Off-the-Road Tires From the People's Republic of*

*China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg.

16,055 (Int'l Trade Admin. Apr. 13, 2018) (revised by *Certain New Pneumatic Off-the-Road*

*Tires From the People's Republic of China: Amended Final Results of Countervailing Duty*

*Administrative Review; 2015*, 83 Fed. Reg. 32,078 (Int'l Trade Admin. July 11, 2018)).

They also claimed that Commerce failed to adjust the antidumping duty cash deposit

rate for export subsidies, as required by 19 U.S.C. § 1677a(c)(1)(C).  *Id*.  For the Final

Results, Commerce refused to make these adjustments, reasoning that "Commerce

continues to find GTC to be ineligible for a separate rate for purposes of these final

results and, thus, is treating GTC as part of the China-wide entity."  *Final I&D Mem*.

---

(and separate rate) respondent, Weihai Zhongwei Rubber Co., Ltd.  That method was
held to be impermissible in *YC Rubber*.  But because the court is ruling in this case that
Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively,
"GTC") are ineligible to be assigned an individually-determined margin or a separate
rate due to their failure to rebut the presumption of government control, these plaintiffs
could not benefit from a redetermined rate for the unexamined separate rate
respondents and, therefore, would lack standing to claim that the agency's failure to
select GTC as an additional respondent for individual examination was unlawful under
the holding of *YC Rubber*.  Neither of the two unexamined separate rate respondents
assigned the 11.87% rate, who potentially would have had standing to make such a
claim, are plaintiffs in this case.

at 24.  Commerce concluded that "because the China-wide entity is not under review,

and the China-wide rate currently in effect is not subject to change, no adjustments for

domestic and export subsidies are appropriate."  *Id*.

     Commerce did not err in refusing to make an adjustment under 19 U.S.C.

§ 1677f-1(f)(1).  That provision requires Commerce, in defined circumstances, to "reduce

the antidumping duty by the amount of the increase in the weighted average dumping

margin" that was caused by a countervailable domestic subsidy.  19 U.S.C.

§ 1677f-1(f)(1).  Any adjustment is conditioned on the ability of Commerce to

"reasonably estimate the extent to which the countervailable subsidy . . . in combination

with the use of normal value determined pursuant to section 1677b(c) of this title, has

increased the weighted average dumping margin for the class or kind of merchandise."

*Id*. § 1677f-1(f)(1)(C).

     The 105.31% rate is considered to be an individually investigated weighted

average dumping margin according to the holding in *CMA*, 1 F.4th at 1037.  Regardless,

that rate is not individual to GTC but is the rate assigned to the PRC-wide entity, which

was not under review, as Commerce recognized in denying the adjustment.  Therefore,

Commerce was not required to make any adjustment to that rate under 19 U.S.C.

§ 1677f-1(f)(1).

     For the same reason, Commerce did not err in declining to make an adjustment

for export subsidies according to 19 U.S.C. § 1677a(c)(1)(C).  Under that provision,

Commerce must increase the price used to establish export price or constructed export price by the amount of any countervailing duty imposed on the subject merchandise to offset an export subsidy.  Like an adjustment under 19 U.S.C. § 1677f-1(f)(1), this adjustment is made in determining a respondent's individual weighted average dumping margin.  Commerce was not required to make this adjustment to the rate applied to the PRC-wide entity, which was not under review.

### III.  CONCLUSION

For the reasons stated in the foregoing, the court concludes that Commerce permissibly determined in the Remand Redetermination that GTC did not rebut the Department's presumption of government control of its export functions and, therefore, did not qualify for a separate rate.  The court concludes, further, that in the Remand Redetermination Commerce permissibly assigned to GTC the PRC-wide entity rate of 105.31%.  For these reasons, the court will enter judgment sustaining the Remand Redetermination.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: May 22, 2023
          New York, New York